171 S.W.3d 558 (2005)
In the Interest of J.R. and B.R.
No. 14-04-00359-CV.
Court of Appeals of Texas, Houston (14th Dist.).
July 28, 2005.
*560 William Connally, Houston, TX, for appellant.
Sandra D. Hachem, Houston, TX, for appellees.
Panel consists of Justices ANDERSON, HUDSON, and FROST.

OPINION
KEM THOMPSON FROST, Justice.
This is an appeal from a judgment terminating the parental rights of a mother and a father to two minor children. The father did not appear at trial and does not appeal the termination of his parental rights. The mother, in four issues, challenges the legal and factual sufficiency of the evidence to support the trial court's termination findings. Under the applicable standard of review, we conclude that no reasonable fact finder could form a firm belief or conviction that the mother engaged in the conduct described in subsections 161.001(D) and (E) of the Texas Family Code, upon which the trial court based its termination judgment. Because the evidence is legally insufficient to support termination of the mother's parental rights, we reverse this part of the trial court's judgment, render a take-nothing judgment as to termination of the mother's parental rights, and remand the case for further proceedings consistent with this opinion.

I. FACTUAL AND PROCEDURAL BACKGROUND
Crystal is the mother of four children, J.R. (hereinafter "John"), B.R. (hereinafter "Belinda"), a son born to Crystal and her husband, and an infant born while this case was pending.[1] On September 16, 2002, the Texas Department of Protective and Regulatory Services n/k/a the Texas Department of Family and Protective Services ("the Agency") removed John and Belinda from the care of Crystal's father.[2] At this time, John was four years old, and Belinda was three years old.
The case was tried to the court. Three witnesses testified. Their cumulative testimony takes up 60 pages in our reporter's record. Of these pages, the testimony elicited by the Agency constitutes fewer than 26 pages.
The first witness, Simona Dunn (hereinafter the "Caseworker") testified as follows:
 She works for the Agency, and she is the caseworker for John and Belinda.
 John and Belinda are placed in a foster home and are doing "okay" there.
 In September 2002, the children came into the Agency's care "because of physical negligence."
 The Agency removed the children from their grandfather, in whose care their mother had left them.

*561  The Agency has pictures indicating the "type of negligence."
 This was not the first time the Agency was involved with this family. This family had a history since 1997. [There is no evidence as to what happened before June 1999.] In June 1999, "there was an open intensive family services case where physical negligence and medical negligence was validated on both [Crystal] and the grandfather." The Agency offered Crystal services in June 1999.
 Nothing "changed with the children this time."
 The Caseworker had the opportunity to review the old case file, which contained pictures. "[I]t was the same conditions."
 As of the Tuesday before trial, Crystal was living with a friend.
 Crystal had been living with her mother-in-law. After her mother-in-law died, Crystal moved in with a friend and has been living sporadically with friends or at her father's home.
 The Caseworker knows the different persons who have been living in the homes in which Crystal has been living, and the Caseworker has concerns regarding the persons with whom Crystal has been living.
 The Caseworker found out that Crystal "was with" her husband's brother, a registered sex offender, and got pregnant by him. This sex offender "was registered to the home where [Crystal] was living. So, we ended up removing  [The Caseworker] and a Montgomery worker ended up removing that baby."
 The Caseworker did not speak to Crystal about the ramifications of living with this sex offender but an investigative worker did. Crystal was made aware that it was inappropriate to be around a sex offender.
 Crystal did not "cease being around this registered sex offender." That was brought to the Caseworker's attention because Crystal brought the registered sex offender to the Agency's office for family visits.
 Despite being told not to bring the registered sex offender to the Agency's office for family visits, she brought him back with her for a subsequent family visit.
 The Caseworker believes it was inappropriate for Crystal to expose the children to Crystal's father because her father had been arrested in 1968 for "molestation, fondling a child."
 Crystal has completed some services; however, she has not completed the following: (1) maintaining and locating stable housing, (2) following through with the "recommendations on the psychiatric to consult medication for her anxiety and her depression."
 The child of the registered sex offender in Montgomery County was six months old at the time of trial.
 Crystal has not demonstrated that she can care for these two children.
 The Caseworker believes Crystal has not demonstrated she can care for these two children for the following reasons: (1) "she kind of lives within the moment"; (2) she has not shown that she can provide a safe and nurturing environment for her kids; (3) she has not "maintained a place to live"; (4) "[s]he continues to put the children around people who could potentially put the children at risk for abuse and negligence"; and (5) she has not demonstrated her ability to adequately care for these children.

*562  The Caseworker did not talk to Crystal about the conditions of the home in which John and Belinda were found in September 2002.
 The Caseworker does not have personal knowledge of who was living in the home in which John and Belinda were found in September 2002.
 The Caseworker did not see the condition of the home in which John and Belinda were found in September 2002.
 The Caseworker believes it would be in the children's best interest that Crystal's rights be terminated because the children are four and six years old and, despite having a year and a half of services, Crystal has shown minimal improvement of her ability to adequately provide the type of care that these children need.
 John and Belinda are doing well in the foster home.
 Since the children have been in CPS custody, Crystal has visited them on a regular basis, and the Caseworker has observed Crystal during those visits.
 Crystal has bonded to the children. The children love Crystal, and she loves them. There is no doubt there is a bond between Crystal and the children.
 The Caseworker is concerned that Crystal is not getting medical attention for her depression and that she has not followed the recommendations of her psychiatrist.
 One week ago Crystal started living with a friend, and the Caseworker has not been out to see Crystal's current living conditions.
 The Caseworker is willing to look at Crystal's new home to see if it is appropriate for the children, but states that there is more to this matter than where Crystal is living.
 The other issue is that the Agency believes that Crystal did not follow the recommendations of the psychiatric evaluation.
 Crystal knowingly left the kids in the home of Crystal's father and that was highly inappropriate.
 The Caseworker did not remove the children from Crystal's father's home in September 2002, and she does not have any personal knowledge of why they were removed.
 The Caseworker is concerned that Crystal cannot provide a safe and nurturing environment.
 The Agency asked Crystal to complete the following services as part of her service plan to obtain her children: (1) locate and maintain stable housing, (2) complete a "4'Cs assessment," (3) complete a psychological assessment and all the recommendations from that assessment, (4) "complete parenting," (5) complete a GED program, and (6) maintain financial resources.
 Crystal completed her 4'Cs evaluation, parenting classes, individual counseling, and a psychiatric evaluation.
 Crystal attended three counseling sessions. Crystal "was self reporting information that wasn't correct, and the therapist discharged her."
 The Caseworker has reason to believe Crystal was not honest with her therapist.
 The three sessions Crystal attended did not constitute completion of her counseling. Crystal did not voluntarily stop attending the counseling services; rather, the counseling contractor terminated Crystal's counseling services.
 The Caseworker had a conversation with Crystal in April 2003 that she *563 should not be living with a registered sex offender; yet, Crystal was still living with a registered sex offender in October 2003. Another worker at the Agency had told her the same thing earlier. This conduct could potentially damage the emotional or physical well-being of these children.
 Crystal told the Caseworker that she was on the medication and that her therapist was discharging her because she was in compliance with the medication and stable housing. The Caseworker has reason to believe that this was not true.
 The Caseworker told Crystal that the Agency was concerned that Crystal's therapist discharged her after only three counseling sessions. The Caseworker also told Crystal that additional therapy sessions were going to come from her case in Montgomery County, so the Agency would not be providing more counseling services in Harris County.
 Crystal has told the Caseworker that she has stable housing and is complying with her medication, but the Caseworker does not believe this has ever been true.
The following are excerpts from the Caseworker's testimony:
Q. And you didn't talk to her about the ramifications of living with a registered sex offender?
A. Well, I had 
...
Yes. I'll say "Yes."
Q. Your earlier testimony was incorrect?
A. Well, initially, no; but after I looked through the file and saw that this was 
...
[The Court]: Are you changing your answer?
A. Well, initially, Judge, we did not know that the mom was living with this man; and once we found that out, I told her that she could not  he could not be a part of these kids' lives. But that was an "initial" question. So initially no, I did not speak with her about that.
[The Court]: All right. So, initially no. But if the question was, "Have you ever talked about it?" your answer is what?
A: "Yes."
...
Q. And how long did [Crystal] live with the registered sex offender?
A. She was there up until the grandmother died. She had  when we went out in October, she was still living there.
[Crystal's counsel]: Objection. Nonresponsive.
[The Court]: Just answer the question asked.
A. Yes.
Q. Just, like, total number of months if you can.
A. From September of '02 to October of '03, she was living there.
Q. So that's some 13 months she was living there?
A. Yes.
The second witness, Stacey Truss (hereinafter the "Investigator") testified as follows:
 She works for the Agency, and she is the caseworker who did the initial investigation.
 She was called out to Crystal's father's house because the Agency had received "a referral for physical negligence and medical negligence of [John] and [Belinda]."

*564  There were concerns about ringworm and flea bites and the condition of the home.
 "We've had, I think, six prior referrals of [Crystal]."
 The Agency had two prior referrals regarding John and Belinda and one prior referral regarding Crystal's father.
 When she arrived at Crystal's father's trailer, the Investigator found deplorable conditions throughout the trailer. She found a knife on the floor "[i]n the bathroom." A toilet bowl was completely brown. There were all kinds of clothes thrown around, bags of trash in the kitchen, dirty dishes, and spoiled food. There were "piles of clothes where kids could pull them down on themselves  just not a healthy living environment for these kids."
 The Investigator said there were "cats  I think three cats in the home and no litter box. When I asked, she said they used the box out [sic] and they go outside in the environment. You could tell they used the bathroom in the house."
 The Investigator took pictures of the conditions of the home and the children. Petitioner's exhibit 1 fairly and accurately depicts the conditions of the home at that time.
 The Investigator talked to Crystal about the conditions of the home.
 Regarding medical negligence "[t]he allegations were that the children had ringworm  pretty significant ringworm  and flea bites and they were allergic to the flea bites."
 The Investigator observed the condition of the children's bodies. John and Belinda were both "very, very thin." You could see their ribcages. You could see the ringworm and flea bites on their bodies.
 The Investigator found out that Harold, the father of John and Belinda, is a registered sex offender.
 The Investigator is aware of another registered sex offender, Anthony, who is the brother of Crystal's husband. Crystal has a son with her husband. Anthony was not Crystal's paramour when the Investigator was involved with the case; however, Crystal later had a child with Anthony. The Investigator had concerns regarding Harold and Anthony having access to the children. The Investigator discussed these concerns with Crystal. Crystal responded by saying that Harold had not been a part of the children's lives for a while. Anthony was living in Crystal's father-in-law's house at that time, and the Investigator discussed her concerns about having a sex offender in Crystal's father-in-law's house. Crystal "was not with [Anthony] at that time." Subsequently, Crystal had a child with Anthony.
 The Investigator believes that termination of Crystal's rights would be in these children's best interests for the following reasons: (1) the Agency has been involved with the children for the same reasons; (2) the Agency "offered family preservation back in 1999 for physical negligence with the same concerns of the condition of the home"; (3) Crystal "still continues to get involved with men who are registered sex offenders"; (4) there were some concerns of sexual abuse in Crystal's own past by her father, but the Agency could not validate that; and (5) the Investigator feels that Crystal has not placed her children's needs above her own.

*565  On September 16, 2002, the Investigator spoke to Crystal in general about sex offenders. About a week later, the Investigator spoke to Crystal specifically about Anthony.
 This case was transferred from the Investigator to the newest caseworker 20 days after the children were removed, around the middle of October 2002. Since then, the Investigator has not been involved in this case.
 "[F]amily preservation" worked with Crystal twice in 1999, and the Agency provided services regarding homemaking and cleaning the house.
The following are excerpts from the Investigator's testimony:
Q. Do you recall the exact date that you spoke with [Crystal] about [Anthony]?
A. I spoke with her in general about sex offenders on 9-16.
Q. What year?
A. 2002. Then. I can't remember exactly when I found out about 
Q. Okay.
[Crystal's counsel]: Objection. Nonresponsive.
Q. You talked to her about [Anthony], specifically on 9-16?
A. I talked to her about sex offenders on 9-16-02. Then a week later I was out there and I found [Anthony] 
[Crystal's counsel]: Objection. Nonresponsive.
A. A week later 
The final witness, Crystal, testified as follows:
 Crystal is aware that Harold and Anthony are registered sex offenders, and she has had children with both men.
 Harold has never provided financial support for John and Belinda.
 Crystal understands that John and Belinda were removed from her father's house because of its condition.
 John and Belinda were at her father's home at that time because her father was taking care of the children while Crystal worked at night and lived at her father-in-law's home in Cleveland, Texas. Her father-in-law did not want the children at his home, so Crystal's father was watching the children. Crystal's father had been watching John and Belinda for one month when the Agency removed them. Since then, the children have been in the Agency's care.
 Before the Agency removed John and Belinda, these children were not living at her father-in-law's house. A few weeks before the Agency removed John and Belinda on September 16, 2002, Crystal "took the children down there" because she "needed somewhere to leave them."
 After the Agency removed John and Belinda, Crystal lived a few months with her mother-in-law.
 Crystal thinks she went to five counseling sessions altogether before the counseling contractor terminated the sessions.
 Crystal sometimes needed medication; however, she did not want to take medication while she was pregnant.
 After living with her mother-in-law for a few months, Crystal lived with her friend Brittany for a month and then with her friend Rachel.
 Crystal has currently been living with her friend Theresa for about a month and a half, and she introduced four letters into evidence in support of this assertion. If Crystal regained custody of John and Belinda, they would *566 live with her at her friend Theresa's home, which is an appropriate place with three bedrooms.
 She has been visiting her children regularly. They are excited to see her and sad when she leaves.
 Crystal is currently unemployed. She has worked as a waitress and is currently looking for a job at Wal-Mart, Waffle House  one of her former employers  and a video store.
 Crystal wants the children returned to her. She is capable of caring for them, and she has a babysitter, Theresa's oldest daughter.
 At the time of trial, Crystal was twenty-one years old, and she was fifteen years old when her first child was born.
 John hit her one time when she told him that her mother had died, and John has never told Crystal that he hates her.
 The Investigator's earlier testimony that Crystal was living with a sex offender around the time that the Agency removed the children was not true because when the Agency removed John and Belinda, Crystal and her father-in-law were the only people living in her father-in-law's home.
 Crystal has no objection to the trial court issuing an injunction that Anthony and Harold cannot see the children.
 She is able to seek medical attention through Medicaid but she does not have health care coverage. At the time the Agency removed the children, they did not have any Medicaid coverage.
 Crystal saw the ringworm on the children when she went to visit them at her father's home, and she put medicine on it. Her father, sister, and brother-in-law also put ointment on it. Crystal did not observe any other illnesses in the children.
During examination of Crystal by her own attorney, the following exchange occurred:
Q. Earlier  did you hear the testimony earlier when the caseworker had testified that you were living with a sex offender?
A. Yes.
Q. Was that true?
A. No  because at the time that the C.P.S. picked up my son and my daughter I was living only with my father-in-law. He was the only person besides me that was living in that house.
Q. Since that time were you living with anybody else during the time of this case?
A. Just Dorothy Weathers ... my mother-in-law, and my dad for a few weeks and then Theresa.
Q. You aren't living with the fathers of any of these children?
A. When Anthony moved in, yes; but it wasn't long.
Q. For how long?
A. Well, it was from September  from September of 
Q. What year?
A. September  from February of 2003 to October of 2003.
The Agency's only closing argument as to the termination of Crystal's parental rights was a plea that "this mother's rights be terminated based on 161.001(E) and (D) and based on the best interest of the children." The guardian ad litem did not introduce any evidence at trial, and the trial court's order compensating the guardian ad litem indicates that she did not conduct any investigation. The only recommendation made at trial by the guardian ad litem was the following sentence, *567 which also was the guardian's entire closing argument: "Your Honor, on behalf of the children, I would concur with the [Agency's] position and ask that the parental rights be terminated."
At the conclusion of the trial, the court terminated the parental rights of both Harold and Crystal as to John and Belinda. In its findings of fact, the trial court found in pertinent part as follows:
 Crystal knowingly brought a registered sex offender to a visit with her children.
 Crystal has not had consistent, stable housing.
 Crystal has not complied with her therapy/treatment.
Both in its termination judgment and in its findings of fact and conclusions of law, the trial court found the following by clear and convincing evidence:
 Crystal knowingly placed or knowingly allowed John and Belinda to remain in conditions or surroundings which endanger their physical or emotional well-being.
 Crystal engaged in conduct or knowingly placed John and Belinda with persons who engaged in conduct which endangers their physical or emotional well-being.
 Termination of Crystal's parental rights is in the best interest of John and Belinda.[3]

II. STANDARD OF REVIEW
The natural right that exists between parents and children is one of constitutional dimensions. Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985). Crystal's parent-child relationship with John and Belinda is a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution. M.L.B. v. S.L.J., 519 U.S. 102, 118-19, 117 S.Ct. 555, 565, 136 L.Ed.2d 473 (1996). A termination judgment is complete, final, and irrevocable, and it divests for all time the parent and child of all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit. Holick, 685 S.W.2d at 20. Consequently, termination proceedings should be strictly scrutinized, and involuntary-termination statutes are strictly construed in favor of the parent. Id. On the other hand, parental rights are not absolute. In re C.H., 89 S.W.3d 17, 26 (Tex.2002). While it is imperative that courts recognize and respect the constitutional underpinnings of the parent-child relationship, it is also essential that children's emotional and physical interests not be sacrificed merely to preserve that right. See id. It is the tension and conflict between these two important interests that often makes parental-termination cases difficult.
Because termination of parental rights is such a drastic remedy, due process and the Texas Family Code require the Agency to prove the necessary elements by the heightened burden of proof of "clear and convincing evidence." See TEX. FAM.CODE ANN. § 161.001 (Vernon 2002); In re G.M., 596 S.W.2d 846, 847 (Tex.1980). In this case, the Agency had to prove by clear and convincing evidence that Crystal engaged in the conduct described in subsection 161.001(1)(D) or (E) and that termination is in the children's best interest.[4]See TEX. FAM.CODE ANN. § 161.001. "Clear and convincing *568 evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (Vernon 2002).
The heightened "clear and convincing evidence" burden of proof alters the appellate legal-sufficiency standard of review. See In re J.F.C., 96 S.W.3d 256, 264-66 (Tex.2002). In conducting such a legal-sufficiency review, a court must look at all the evidence in the light most favorable to the termination findings to determine whether a reasonable trier of fact could have formed a firm belief or conviction that these finding are true. See id. at 266. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal-sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its findings if a reasonable factfinder could do so. Id. Furthermore, a reviewing court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. Id. This does not mean that a reviewing court must disregard all evidence that does not support the findings in question. Id. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. Id. If, after conducting its legal-sufficiency review of the record evidence, a court determines that a reasonable factfinder could not form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. Id.; see also In re J.L., 163 S.W.3d 79, 84-85 (Tex.2005) (outlining legal-sufficiency standard of review). We apply the same legal-sufficiency standard in reviewing the evidence regardless of whether we are reviewing a jury's verdict or, as in this case, the trial court's findings following a bench trial. Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex.1994).

III. ISSUES AND ANALYSIS
In her first issue, Crystal asserts that the evidence is legally insufficient to support the trial court's findings under subsections 161.001(1)(D) and (E). The trial court found that the Agency proved by clear and convincing evidence the following:
 Crystal knowingly placed or knowingly allowed John and Belinda to remain in conditions or surroundings which endanger their physical or emotional well-being.
 Crystal engaged in conduct or knowingly placed John and Belinda with persons who engaged in conduct which endangers their physical or emotional well-being.
See TEX. FAM.CODE ANN. § 161.001(1)(D) and (E).

A. Is the evidence legally sufficient to support the trial court's finding under subsection 161.001(1)(D)?
The trial court found that Crystal knowingly placed or knowingly allowed John and Belinda to remain in conditions or surroundings which endangered their physical or emotional well-being. See TEX. FAM.CODE ANN. § 161.001(1)(D). Subsection 161.001(1)(D) focuses on John and Belinda's environment, and the Agency had the burden of proving by clear and convincing evidence that this environment endangered the children's physical or emotional well-being. See Doyle v. Texas Dep't of Protective & Reg. Servs., 16 S.W.3d 390, 394 (Tex.App.-El Paso 2000, pet. denied). In support of this ground, the Agency asserts that it sufficiently *569 proved environmental endangerment to John and Belinda based on the following: (1) Crystal's maintaining a relationship with Anthony, a registered sex offender who could place John and Belinda at risk, and (2) placing or allowing John and Belinda to remain in the unsanitary conditions at the home of Crystal's father.
"Endanger" means to expose to loss or injury or to jeopardize. Texas Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987). Endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment. Boyd, 727 S.W.2d at 533. Nonetheless, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. Id. Rather, it is sufficient that the child's well-being be jeopardized or exposed to loss or injury.

Alleged Exposure to Sex Offender
The Agency asserts on appeal that the evidence at trial is sufficient to support the trial court's finding under subsection 161.001(1)(D) based on evidence that Crystal decided to maintain a relationship with Anthony, a sex offender who could place her children at risk, after the Agency warned her that she should not become involved with registered sex offenders. The Agency also argues that legally sufficient evidence supports this finding because there is evidence that Crystal brought Anthony to two supervised visits with her children at an office of the Agency. The Agency asserts that this conduct of Crystal regarding Anthony shows Crystal's intent to involve Anthony in her family affairs and jeopardize John and Belinda. The Agency asserts that this behavior constitutes an "endangering lifestyle" that proves environmental endangerment of John and Belinda. The trial court found that Crystal "knowingly brought a registered sex offender to a visit with her children."
There are several problems with the Agency's argument. The Caseworker testified that Crystal twice "brought [Anthony] up to the office for family visits," once after being told not to do so again by the Agency. On the other hand, there is no evidence that John and Belinda saw Anthony or had any contact with him while he was present at the Agency's office on these two occasions. Further, even if there had been evidence that Anthony had been in the children's presence on these two occasions, it would not be reasonable to conclude that Anthony's presence at the office endangered John and Belinda, given that the Agency supervised these visits. Furthermore, in a section 161.001(1)(D) case, the relevant time frame to determine whether there is clear and convincing evidence of endangerment is before the Agency removed John and Belinda. See Ybarra v. Texas Dep't of Human Servs., 869 S.W.2d 574, 577 (Tex.App.-Corpus Christi 1993, no writ). The undisputed evidence at trial proved that Anthony did not become Crystal's paramour until after the Agency removed John and Belinda. Therefore, Crystal's affair with Anthony and her giving birth to his child all occurred when John and Belinda were in the Agency's care and cannot constitute environmental endangerment. See Ybarra, 869 S.W.2d at 577.
The Investigator stated that, one week after the Agency removed John and Belinda, she told Crystal she should not be living in the same place as Anthony because he was a registered sex offender. The Caseworker stated that she repeated this admonition in April 2003 and that Crystal was still living with Anthony in October 2003. The Agency does not contend, and the trial court could not reasonably have found, that the children were *570 endangered during any Agency-supervised family visit. Rather, the Agency argues that it is reasonable to infer from Crystal's bringing Anthony to the Agency's office on these two occasions, that if Crystal's parental rights are not terminated, she will endanger the children by contact with Anthony in the future.
The unambiguous language of subsection 161.001(1)(D) requires proof of Crystal's knowing exposure of the children to an endangering environment in the past. Any alleged likelihood that Crystal will knowingly expose the children to a dangerous environment in the future is not sufficient to prove a violation of subsection 161.001(1)(D). Such a likelihood would be relevant to the issue of whether termination is in the children's best interest and also would be relevant to the issue of how much contact Crystal should have with her children if her parental rights are not terminated, but it does not amount to proof of a past act of knowing environmental endangerment.[5]
The evidence at trial is silent as all of the following pieces of information about Anthony:
 The correct spelling of his last name.
 His age.
 The sexual offense or offenses that required Anthony to register. For example, the record does not indicate whether Anthony's conviction is for aggravated sexual assault of a young child when Anthony was in his thirties or whether it was for unforced sexual relations with a 16-year old girl who willingly participated and whom Anthony believed was 17 years old when he was 20 years old. See TEX. PEN.CODE ANN. § 22.011(a), (c), (e) (Vernon Supp.2005).
 Any evidence that Anthony was living in the same place as Crystal before September 23, 2002one week after the Agency removed John and Belinda.[6]
 Any evidence that Crystal has ever left John and Belinda alone with Anthony *571 or allowed Anthony unsupervised contact with the children.
 Any evidence that John and Belinda have ever lived in the same home as Anthony.
The undisputed evidence shows that Crystal left John and Belinda in the care of her father from the beginning of September 2002 and that the Agency removed the children from Crystal's father on September 16, 2002. There is no evidence that Crystal knowingly exposed the children to Anthony during this period or at any prior time. Accordingly, under the applicable standard of review, even if exposing John and Belinda to Anthony would be placing them in an endangering environment, no reasonable factfinder could form a firm belief or conviction that, prior to September 16, 2002, Crystal exposed the children to Anthony. See In re K.W., 138 S.W.3d 420, 431-32 (Tex.App.-Fort Worth 2004, pet. denied) (holding evidence legally insufficient to support trial court's finding of endangerment under subsection 161.001(1)(D)); In re T.H., 131 S.W.3d 598, 603-04 (Tex.App.-Texarkana 2004, pet. denied) (same).
Another missing link in the evidence at trial was the issue of when Crystal learned that Anthony is a registered sex offender. Although Crystal testified at trial that she is aware that Anthony is a registered sex offender, nobody ever asked her when she learned this information. The Investigator testified that she mentioned to Crystal that Anthony was a registered sex offender on September 23, 2002; however, there is no evidence that Crystal knew this fact before September 23, 2002. Therefore, even if there had been evidence that, prior to September 16, 2002, Crystal exposed the children to Anthony, under the applicable standard of review, no reasonable factfinder could form a firm belief or conviction based on this conduct that Crystal knowingly placed or knowingly allowed the children to remain in an environment that endangered their physical or emotional well-being. Accordingly, the evidence regarding Anthony is legally insufficient on the issue of endangerment under subsection 161.001(1)(D). We conclude that the testimony regarding Anthony is legally insufficient to support the trial court's finding that Crystal acted knowingly as to any alleged environmental endangerment based on Anthony. See In re T.H., 131 S.W.3d at 603-04 (holding evidence legally insufficient to support trial court's finding as to "knowingly" element of subsection 161.001(1)(D)).
Though Crystal's actions with respect to Anthony reflect very poor judgment, under the applicable standard of review, we conclude the evidence regarding Anthony is legally insufficient to support the trial court's termination finding under subsection 161.001(1)(D).

Unsanitary Conditions
The Agency also asserts that there is legally sufficient evidence to prove that Crystal knowingly placed or knowingly allowed John and Belinda to remain in unsanitary conditions at her father's house that endangered the children's physical or emotional well-being. Regarding the conditions at the home of Crystal's father, the evidence shows:
 When she arrived at Crystal's father's trailer home, the Investigator found "deplorable conditions throughout the trailer." She found a knife on the floor "[i]n the bathroom." The toilet bowl was completely brown. There were all kinds of clothes thrown around, bags of trash in the kitchen, dirty dishes, and spoiled food. There were "piles of clothes where kids could pull them down on themselves  *572 just not a healthy living environment for these kids."
 The Investigator said there were "cats  I think three cats in the home and no litter box. When I asked, she said they used the box out [sic] and they go outside in the environment. You could tell they used the bathroom in the house."
 The Investigator took pictures of the conditions of the home and the children. Petitioner's exhibit 1 fairly and accurately depicts the conditions of the home at that time.
 Regarding medical negligence "[t]he allegations were that the children had ringworm  pretty significant ringworm  and flea bites and they were allergic to the flea bites."
 The Investigator observed the condition of the children's bodies. John and Belinda were both "very, very thin." You could see their ribcages. You could see the ringworm and flea bites on their bodies.
The Petitioner offered a single exhibit that the trial court admitted into evidence. This exhibit contains sixteen photographs that the Investigator took of John and Belinda and part of Crystal's father's residence on September 16, 2002. In general the quality of the pictures in the record is poor. There are two pictures labeled "Living Room." In one of these pictures, the only thing that can be seen clearly is John leaning on a chair. The other picture shows what appears to be a stereo system along with other items on some shelves, two chairs with some items on them, and an air conditioner in a window. There are other items in the room but there is no visible trash or other unsanitary items. There are two pictures labeled "Kitchen" that show cabinets, a sink, a countertop containing what appear to be dirty dishes, a microwave oven, some food, a curtain covering a window, and what appears to be a pile of items including some trash. There is one picture labeled "Children's Bathroom." This picture shows a vanity containing what appears to be an empty and clean sink with a hair brush and other toiletries around it. The only items visible on the floor are a white laundry container which appears to be full of clothes and a stray sock. This photo does not show the toilet or any knife. There is a picture labeled "Children's Bedroom." It shows a mattress on the floor with what appear to be blankets on top, a curtain covering a window, and an air conditioner in the window. There do not appear to be observable amounts of clothes, trash, or any unsanitary items in this photo.
There is a photograph labeled "[Crystal's father's] Bedroom." This photograph shows what appears to be a mattress on the floor with a blanket on it, a football, and some other items that might include clothes or trash, although there are no visible large piles of any items. There is a photo labeled "[Crystal's father's] Closet." This photo shows clothes on hangers and also what appear to be piles of clothes. There is a photo of a third bedroom that shows a mattress on the floor and some piles of clothes alongside the mattress. There is a photo labeled "Kitchen Table" that shows a table covered with a ripped tablecloth with what appear to be food items on it, and a chair. There is a photo labeled "Refrigerator" that shows a refrigerator and freezer that are somewhat messy but appear to contain a variety of food items. There is a photo labeled "[Crystal's father's] Bathroom" showing a bathtub and a toilet bowl that appears to contain a normal amount of water, although the water appears to be brown. Even if one toilet was not working properly, there were two bathrooms in this home, and there was no evidence that the home *573 lacked a functioning toilet. There are various items on the floor, none of which appear to be a knife, and there is a clear path to the bathtub. Although the Investigator stated that she "could tell [the cats] used the bathroom in the house," she did not indicate that she observed cat excrement in the home. There is no indication of any cats or cat feces in the photographs the Investigator took of the home.
In addition to testifying about the untidy state of the home, the Investigator testified that there was a knife on a bathroom floor. The entire testimony concerning the knife consists of the following: "[i]n the bathroom I found a knife on the floor." There is nothing in the record to indicate the type of knife she observed (for example, a butter knife or a machete) or whether the knife was found in the children's bathroom or in the grandfather's bathroom. Apparently, the Investigator did not photograph the knife or document the location where it was found. At trial, she did not describe the knife, nor did she state how long the knife had been on the floor, whether the children had access to it, or whether Crystal was aware of the situation and failed to take appropriate action. The Investigator did not give any testimony concerning any discussions she or any other agency personnel may have had with Crystal about the knife, nor did she indicate that Crystal was aware of the knife being on the floor of a bathroom in the grandfather's home or that the knife ever posed a safety risk to John or Belinda.
In addition to setting forth evidence about the physical condition of the home, the Agency also offered evidence about the condition of the children. There is a picture of John and Belinda. Both children seem thin, as children in their age range typically are, but not emaciated. Both children are smiling and appear to be playing. Belinda is fully clothed. John has pants on but no shirt, and there are no flea bites visible on his body. There is another picture showing a closeup, back view of the lower half of Belinda's body. The quality of the picture is not good. There seem to at least five blemishes on her skin. It is possible that some or all of these might be flea bites. The picture does not show whether these slight discolorations are insect bites or some kind of skim blemishes. During the September 2002 visit, the Investigator inspected the children and found they had ringworm and flea bites. The record, however, also shows they were given a treatment (a topical ointment) for this common childhood ailment. There was no evidence offered as to the source of the ringworm and flea bites or how long the children had had ringworm and flea bites. There is no indication that the children required medical attention beyond that provided by their caregivers.
The Investigator described three-year old Belinda and four-year old John as "very, very thin"; however, there is no indication in the record that the children were malnourished, underfed, or hungry. Many young children are "very, very thin"; thinness, alone, is not an indication of malnutrition or malnourishment. If the Agency interviewed the children about their eating habits or the availability of food in their home, that evidence does not appear in our record. There is no evidence in the record to suggest the children were not fed or that the food supply in the home was inadequate. Crystal's testimony was uncontested that her children had been at her father's house for approximately one month before the Agency removed them on September 16, 2002.
Although it is true that unsanitary conditions can qualify as surroundings that endanger a child, it is also true that most cases upholding termination of parental rights based on unsanitary home conditions *574 do not uphold the termination findings solely based on these unsanitary conditions. In In re M.C., the Texas Supreme Court concluded that, under the former standard of review, the evidence of unsanitary conditions was legally sufficient to terminate parental rights under subsection 161.001(1)(D) or (E). 917 S.W.2d 268, 269-70 (Tex.1996). However, this was based in part on evidence that, on at least two occasions the mother left the children alone in potentially dangerous conditions. See id. On one occasion, two young children were found wandering on a highway at night, and an infant was found at home alone. See id. On another occasion, the mother left her children alone in a car with the engine running, and the children drove the car into a neighbor's house. See id. In contrast, in the case at hand, there is no allegation that Crystal left the children unsupervised, and there is no evidence controverting the Caseworker's testimony that the children were removed from their grandfather.
The In re M.C. court also found legally sufficient evidence, in part, based on "extraordinarily unsanitary conditions." Id. at 270. There was testimony that the children's home was infested with roaches, that the children ate food off the floor and out of the garbage, and that the floor and furniture were littered with food, dirty clothes, garbage, and feces. Id. The children often wore soiled diapers and clothes, and sometimes had dried food, feces, and mucus on their skin and clothes. Id. There was evidence the children "were unclean" and "had a bad odor." Id. One of the children had dead cockroaches matted in her hair, another infant had dead roaches inside her bottle. Id. There was evidence that during one summer, the mother moved the family into a house that lacked plumbing or drinking water, and the children were found suffering from severe diarrhea and vomiting. Id. There was also evidence that the children were often sick with diarrhea and vomiting, but that their mother rarely took them to the doctor. Id. The facts in In re M.C. are not even close to the facts of this case. The children had only been in their grandfather's house for approximately one month. There is no evidence that their grandfather's home lacked plumbing or drinking water. John and Belinda were not found to be dirty or having a bad odor. There was no testimony that they were unclean or had hygiene problems. They did not suffer from severe diarrhea or vomiting. There is no evidence that John and Belinda were eating contaminated food or that their grandfather's home was infested with insects or rodents or was littered with feces.
In another case cited by the Agency, there was evidence that the children were left unsupervised in the home, with animal urine and feces in which one of the children was seen walking barefoot. See In re H.B., No. 07-04-0010-CV, 2004 WL 1313764, at *2 (Tex.App.-Amarillo June 14, 2004, no pet.)(mem.op.). Another child had a bottle of curdled milk, and there were "flies everywhere," some of which attempted to alight on the faces and in the mouths of the children. See id. The children were dirty and had access to a tattoo gun with needles, spray-painted towels, paints, and cigarette lighters. Id. There was also evidence that the mother would leave her children alone on multiple occasions for several days at a time with a mentally handicapped man, who had no training in how to care for children. Id. at *3. The mother continued to leave her children with this man, even after she had been told by others that he was molesting the children and even after the mother found her children with the man only in towels or their underwear. Id. In the case at hand, there is no evidence of flies everywhere *575 or the children being left unattended with potentially hazardous items. Nor is there evidence that they were left alone with any person suspected of molesting them. There is no evidence that any person has ever sexually assaulted or attempted to sexually assault John or Belinda.
The Agency also cites In re P.E.W., 105 S.W.3d 771 (Tex.App.-Amarillo 2003, no pet.). This case involved a home in which
 The floors were very dirty, and onion plants sprouted from the carpet.
 The house was infested with cockroaches, which crawled in and about baby bottles.
 The toilet did not work, and the house smelled horrible.
 The house lacked running water at times, and part of its walls and ceiling were caving in and falling down.
 The house smelled of animal feces and urine.
 Boards with rusty nails and broken glass were strewn about in the yard.
 One of the children suffered a cut requiring ten stitches as a result of coming into contact with a nail in a closet.
 The mother's husband sexually abused two of their children, and although the mother professed ignorance, there was evidence that she was made aware of this sexual abuse and did nothing.
In re P.E.W., 105 S.W.3d 771, 777-79 (Tex.App.-Amarillo 2003, no pet.). Again, there is no evidence in the case at hand of any sexual abuse of the children or of a home environment similar to that in P.E.W. Likewise, the other case the Agency cites is not analogous. See In re K.M.B., 91 S.W.3d 18, 22-25 (Tex.App.-Fort Worth 2002, no pet.) (involving home in which the child was infested with head lice and lived among animal feces, mother continued using drugs, there were problems with roaches and terrible odors, mother left the child with someone incapable of properly caring for her, and mother constructively abandoned the child).
As a general proposition, it is possible for a factfinder to find environmental endangerment based solely on evidence of extraordinarily unsanitary living conditions in the home. Nonetheless, under the applicable standard of review, we conclude that the conditions of the home of Crystal's father, while not an ideal environment for the children, do not rise to the level of endangering the physical or emotional well-being of John and Belinda. See Doyle, 16 S.W.3d at 394-95 (holding evidence was legally insufficient to support finding under subsection 161.001(1)(D) despite evidence that apartment in which children lived was roach-infested and that the stove and oven did not work); In re P.S., 766 S.W.2d 833, 836-38 (Tex.App.-Houston [1st Dist.] 1989, no writ) (holding evidence was legally insufficient to support finding under subsection 161.001(1)(D) despite evidence of a "deplorable" apartment in which dirty diapers and soiled clothing were scattered throughout the apartment, the sink was filled with dirty dishes, garbage was all over the place, the refrigerator was virtually empty, and the environment was generally unkept and unclean). Accordingly, after reviewing the evidence in this record under the applicable standard of review, we conclude that no reasonable factfinder could form a firm belief or conviction that Crystal knowingly exposed John and Belinda to an unsanitary living environment that endangered their physical or emotional well-being. In sum, we conclude the evidence is legally insufficient to support the trial court's finding under subsection 161.001(1)(D).

B. Is the evidence legally sufficient to support the trial court's finding under subsection 161.001(1)(E)?
*576 The trial court found that Crystal engaged in conduct or knowingly placed John and Belinda with persons who engaged in conduct which endangered their physical or emotional well-being. See TEX. FAM.CODE ANN. § 161.001(1)(E). Subsection 161.001(1)(E) focuses on Crystal's conduct, and the Agency had the burden of proving by clear and convincing evidence that this conduct endangered the children's physical or emotional well-being. See Doyle, 16 S.W.3d at 395. In support of this ground, the Agency asserts that Crystal engaged in a course of conduct that endangered the children's physical or emotional well-being by (1) involving herself with Anthony, a man she knew was a registered sex offender, and (2) leaving her children in unsanitary living conditions.

Alleged Exposure to Sex Offender
There is evidence in the record of the following:
 Anthony is Crystal's brother-in-law.
 Crystal knew, as of September 23, 2002, that Anthony is a registered sex offender.
 Sometime after September 23, 2002, Crystal began a sexual relationship with Anthony and later gave birth to his son.
 Crystal brought Anthony to two family visits supervised by the Agency.
Crystal's conduct in associating with a registered sex offender and in allowing him to accompany her to Agency-supervised visits was improper. Nonetheless, we must determine if there is legally sufficient evidence that this improper course of conduct endangered the children's physical or emotional well-being. See TEX. FAM.CODE ANN. § 161.001(1)(E).
As discussed above, there is no evidence that John and Belinda saw Anthony or had any contact with him while he was present at the Agency's office on these two occasions. Further, even if there had been evidence that Anthony was in the children's presence on these two occasions, it would not be reasonable to conclude that Anthony's presence endangered John and Belinda, given that the Agency supervised these visits. The only time any witness at trial specifically addressed the issue of endangerment to the children's emotional or physical well-being was when the Caseworker testified that Crystal's continuing to live with Anthony "could potentially damage the emotional or physical well-being of these children." Conclusory statements of law such as this are no evidence. See Anderson v. Snider, 808 S.W.2d 54, 55 (Tex.1991) (stating that legal conclusions and conclusory statements are not legally sufficient evidence). There is no evidence that John or Belinda has any knowledge of Crystal's relationship with Anthony, and there is no evidence in the record that John or Belinda has ever met Anthony or had any contact with him whatsoever.
The Agency does not contend, and the trial court could not reasonably have found, that the children were endangered by Anthony during any Agency-supervised family visit. Rather, the Agency argues that it is reasonable to infer from Crystal's allowing Anthony to accompany her to these two visits, that if Crystal's parental rights are not terminated, she will endanger the children by contact with Anthony in the future. First of all, the evidence shows that Crystal stopped living with Anthony in October of 2003, five months before trial, and the record does not reflect the status of Crystal's relationship with Anthony as of trial, except that Anthony and Crystal are parents of a young infant over whom the Agency currently has custody. Crystal also testified that she would agree to being enjoined from having John and Belinda see Anthony. In any event, *577 the unambiguous language of subsection 161.001(1)(E) requires proof of endangerment by Crystal's past conduct, not by possible future conduct. There is no evidence that Crystal has exposed the children to Anthony. Under the applicable standard of review, we conclude that, based on the evidence at trial, no reasonable factfinder could form a firm belief or conviction that the children's physical or emotional well-being was endangered by Crystal's course of conduct in having a sexual relationship with Anthony while John and Belinda were in the Agency's custody. See In re K.W., 138 S.W.3d at 431-32 (holding evidence legally insufficient to support trial court's finding of endangerment under subsection 161.001(1)(E)); In re T.H., 131 S.W.3d at 604 (same). Accordingly, the evidence regarding Anthony is legally insufficient on the issue of endangerment under subsection 161.001(1)(E). Though it is hardly debatable that Crystal has exercised very poor judgment with respect to Anthony, under the applicable standard of review, we conclude the evidence regarding Anthony is legally insufficient to support the termination finding under subsection 161.001(1)(E).

Unsanitary Conditions
The Agency argues the unsanitary conditions of Crystal's father's home support the trial court's finding under subsection 161.001(1)(E) as well. However, as discussed above, under the applicable standard of review, we have concluded that the conditions of Crystal's father's home, while not an ideal environment for the children, do not rise to the level of endangering the physical or emotional well-being of John and Belinda. See Doyle, 16 S.W.3d at 394-95; In re P.S., 766 S.W.2d at 836-38. Therefore, for the same reasons, after reviewing the evidence in this record under the applicable standard of review, we conclude that no reasonable factfinder could form a firm belief or conviction that Crystal engaged in a course of conduct that endangered the children's physical or emotional well-being by exposing them to an unsanitary living environment.

Lack of Stable Housing
The trial court found that Crystal has not had consistent, stable housing; however the trial court did not expressly find that this failure to maintain stable housing endangered the children's physical or emotional well-being. On appeal, the Agency does not argue that Crystal's failure to maintain stable housing is a basis for affirming the trial court's judgment. However, we consider whether there is legally sufficient evidence to support an implied finding under subsections 161.001(1)(D) and (E) based on this conduct.
First, we note that there is a statutory basis for terminating parental rights based on the parent's failure to comply with the provisions of a court order that specifically establishes the actions necessary for the parent to obtain the return of a child who has been in the permanent or temporary managing conservatorship of the Agency for not less than nine months as a result of the child's removal from the parent under Chapter 262 of the Family Code. See TEX. FAM.CODE ANN. § 161.001(1)(O). Although Crystal's family service plan listed the maintenance of proper housing as a goal, the trial court did not order Crystal to maintain stable housing as a necessary action to obtain the return of her children.[7] *578 Therefore, the trial court did not and could not properly have found that termination was appropriate based on subsection 161.001(1)(O).
There is some evidence that Crystal moved rather frequently, and the Caseworker stated that Crystal had failed to maintain stable housing. Presuming for the sake of argument there is some evidence Crystal failed to maintain consistent, stable housing, there is still no evidence that such conduct endangered the children's physical or emotional well-being. Failure to maintain stable housing is relevant to determining whether termination is in the children's best interests, and in appropriate cases, it may support a 161.001(1)(O) finding. See Doyle, 16 S.W.3d at 398. Failure to maintain a stable home, combined with failure to provide for the children's needs, may also support a finding under subsection 161.001(1)(E). However, the Agency has not cited and this court has not found a case that upholds a subsection 161.001(1)(E) finding based solely on failure to maintain stable housing. Under the applicable standard of review, we conclude the record lacks legally sufficient evidence that any failure by Crystal to maintain stable housing endangered the children's physical or emotional well-being. See Doyle, 16 S.W.3d at 398-99 (holding there was legally insufficient evidence that mother's failure to maintain stable home endangered the children's physical or emotional well-being).

Failure to Comply with Therapy or Treatment
The trial court found that Crystal "has not complied with her therapy/treatment." The trial court, however, did not expressly find that this conduct endangered the children's physical or emotional well-being. On appeal, the Agency does not argue that this conduct is a basis for affirming the trial court's judgment. Furthermore, the trial court did not find and could not have made a proper finding that this conduct was a basis for a finding under subsection 161.001(1)(O) because the court did not order Crystal to comply with her therapy or treatment as a necessary action to obtain the return of her children. However, we consider whether there is legally sufficient evidence to support an implied finding under subsections 161.001(1)(D) and (E) based on this conduct.
Regarding therapy and counseling, the Caseworker testified that Crystal has not followed through with the recommendations from her psychiatric evaluation by taking medication for anxiety and depression. The Caseworker also testified that Crystal attended only three counseling sessions and that the counseling contractor refused to see her after that because she "was self reporting information that wasn't correct." The Caseworker told Crystal that additional therapy sessions were going to come from her case in Montgomery County, so the Agency would not provide further counseling services in Harris County. There is no evidence that any failure by Crystal to take medication or any alleged failure to complete counseling endangered the children's physical or emotional well-being. Under the applicable standard of review, we conclude the evidence is legally insufficient to support a finding under subsection 161.001(1)(D) or (E) based on this conduct.

Exposure to Crystal's Father
Although not mentioned in the trial court's findings of fact and not argued by the Agency on appeal as a basis for termination of Crystal's parental rights, the Caseworker testified at trial that she believes *579 it was inappropriate for Crystal to expose John and Belinda to Crystal's father because her father was arrested in 1968 for fondling a child. Crystal was born in 1982. There is no evidence that Crystal knew that her father had been arrested in 1968 for allegedly fondling a child, and there is no evidence that Crystal's father has ever been charged with or convicted of any sexual assault or indecency with a child. The Investigator testified that the Agency had concerns that Crystal's father had sexually abused Crystal in the past but that the Agency could not validate these concerns. The Agency's unsubstantiated concerns and an arrest more than 35 years ago do not constitute legally sufficient evidence that Crystal engaged in conduct or knowingly placed John and Belinda with persons who engaged in conduct which endangered their physical or emotional well-being. See In re K.W., 138 S.W.3d at 431-32; In re T.H., 131 S.W.3d at 604.
Accordingly, after reviewing the evidence in this record under the applicable standard of review, we conclude that no reasonable factfinder could form a firm belief or conviction that Crystal engaged in conduct or knowingly placed John and Belinda with persons who engaged in conduct which endangered their physical or emotional well-being.

CONCLUSION
We fully recognize the challenges faced by the Agency in attempting to help Crystal with her children, and we commend their continued efforts to assist her in enhancing her parenting skills. But the trial court cannot break the ties between a parent and child without clear and convincing evidence supporting one of the grounds listed in subsection 161.001(1). The Agency elicited no more than 26 pages of testimony at trial, and this testimony seemed to focus only on whether termination was in the best interests of the children. On this record, we conclude the evidence is legally insufficient to support the trial court's findings under subsections 161.001(1)(D) and (E), and we sustain Crystal's first issue. Accordingly, we reverse the trial court's judgment to the extent it terminates Crystal's parental rights as to John and Belinda, and we render judgment in part that the Agency take nothing as to termination of Crystal's parental rights. Crystal has not challenged on appeal the trial court's appointment of the Agency as sole managing conservator of John and Belinda, and we do not reverse the trial court's judgment in this regard. We remand this case to the trial court for further proceedings consistent with this opinion. See TEX.R.APP. P. 43.3(a).
NOTES
[1] To protect the privacy of the parties in this case, we identify the children by the fictitious names "John" and "Belinda," and we identify the parents by their first names only. See TEX. FAM.CODE ANN. § 109.002(d) (Vernon 2002).
[2] The Agency's original petition in the trial court and all of the evidence on this issue at trial reflect that the Agency removed John and Belinda on September 16, 2002, and the Agency agrees with this date in its appellate brief.
[3] The trial court also terminated the parental rights of the children's father, Harold. He has not appealed the termination of his parental rights, so this part of the trial court's judgment is not before us.
[4] Unless otherwise specified, all statutory citations in this opinion are to the Texas Family Code.
[5] The trial court did not order Crystal to avoid contact with Anthony as a necessary action to obtain the return of John and Belinda. Although this issue is not briefed by the parties nor necessary to our decision, we note that the enforceability of such an order might be in doubt. Compare Lawrence v. Texas, 539 U.S. 558, 573-79, 123 S.Ct. 2472, 2481-84, 156 L.Ed.2d 508 (2003) (stating that personal decisions relating to private, consensual sexual conduct, marriage, procreation, contraception, family relationships, and child rearing are constitutionally protected) with City of Sherman v. Henry, 928 S.W.2d 464, 468-74 (Tex.1996) (holding that there is no constitutional right to engage in adultery under either the Texas or United States Constitution). If the trial court had done so and if such an order were enforceable, then the trial court could have terminated Crystal's parental rights based on subsection 161.001(1)(O). In that event, the language of subsection 161.001(1)(O) would accommodate the Agency's argument regarding Anthony. Because this provision is not before us, we must focus on the language of the two provisions in question, both of which require proof that the children have been endangered in the past, rather than the potential for endangerment in the future if Crystal's parental rights are not terminated. See TEX. FAM.CODE ANN. § 161.001(1)(D) and (E).
[6] The Caseworker testified that Crystal lived in her father-in-law's house from September 2002 to October 2003. Crystal stated that Anthony lived with her at her father-in-law's house only from February 2003 to October 2003, but under the legal-sufficiency standard of review, we presume the trial court resolved this dispute in favor of the Caseworker's statement because a reasonable factfinder could do so. The Investigator, in an interrupted statement at trial, mentioned that Anthony and Crystal were both living at her father-in-law's house on September 23, 2002, but there is no evidence of when Anthony started living at his father's house or that he was living there before September 23, 2002.
[7] Although the trial court did order Crystal to comply with each requirement set out in any service plan, Crystal's service plan did not set out the maintenance of stable housing as a requirement, and it unambiguously stated that the goal of proper housing was not ordered by the trial court.