# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-20-00364-CV

---

### T. A. W. and C. E., Appellants

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 126TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-18-005653, THE HONORABLE MAYA GUERRA GAMBLE, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Appellants T.A.W. (Mother) and C.E. (Father) appeal from the trial court's final order, signed after a bench trial, terminating their parental rights to their children.[1] The children involved in this proceeding are "Charles," who was nine when the order was signed; "Mark," who was seven; and "Clare," who was five. As statutory grounds for termination, the trial court found that both Mother and Father had knowingly placed or allowed the children to remain in conditions that endangered their well-being, engaged in conduct or knowingly placed the children with someone who engaged in conduct that endangered the children's well-being, and failed to comply with the requirements of a court order that established the actions necessary to regain custody. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O).

---

[1] For the sake of the children's privacy and for clarity, we refer to the parents as "Mother" and "Father" and to the children and other involved individuals by pseudonyms. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

Both parents filed notices of appeal. Mother's attorney filed a brief challenging the legal sufficiency of the evidence supporting the trial court's findings of each of the statutory grounds and the factual sufficiency of the evidence supporting the trial court's best interest finding. Father's attorney filed a brief challenging the legal and factual sufficiency of the evidence supporting the trial court's finding of the (O) ground and the legal and factual sufficiency of the evidence supporting the trial court's best interest finding. Father's attorney also complained of the conduct of the trial court proceedings, specifically the trial court's questioning of some witnesses. We will affirm the trial court's order.

**STANDARD OF REVIEW**

To terminate a parent's rights to his or her child, the Department must prove by clear and convincing evidence that the parent engaged in conduct that amounts to at least one statutory ground for termination pursuant to section 161.001 and that termination is in the child's best interest. *Id.* § 161.001; *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm conviction or belief as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). In our review, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). In evaluating the legal sufficiency of the evidence, we look at "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true."

*In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). We "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so" and "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible," *J.F.C.*, 96 S.W.3d at 266, but we need not disregard undisputed evidence contrary to the determination, *K.M.L.*, 443 S.W.3d at 113. Evidence is legally sufficient unless after reviewing the evidence in the proper light, including undisputed evidence that does not support the findings, we conclude that no reasonable factfinder could have formed a firm belief or conviction that the Department carried its evidentiary burden. *J.F.C.*, 96 S.W.3d at 266; *A.C.*, 577 S.W.3d at 697.

Factual sufficiency requires "weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). "In a factual sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of the finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

## STATUTORY GROUNDS

The trial court may order termination of the parent-child relationship under subsection (D) if clear and convincing evidence establishes that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," Tex. Fam. Code § 161.001(b)(1)(D), and under

subsection (E) if the evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," *id.* § 161.001(b)(1)(E). Both subsections require proof of endangerment, which means exposing a child to loss or injury, or jeopardizing a child's emotional or physical well-being. *See Texas Dep't of Fam. & Protective Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *A.C.*, 577 S.W.3d at 698-99. A finding of endangerment requires more than the threat of metaphysical injury or ill effects from a less-than-ideal family environment, but the Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *A.C.*, 577 S.W.3d at 699. "Endangerment does not need to be established as an independent proposition but may be inferred from parental misconduct." *A.C.*, 577 S.W.3d at 699. Evidence of domestic violence is relevant to endangerment, even if the violence is not directed at the child. *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.); *In re P.W.*, 579 S.W.3d 713, 727 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

Subsection (D) focuses on the child's environment—which includes the child's living conditions and the environment produced by the conduct of the parents or others in the home—and whether the environment itself endangered the child, while subsection (E) focuses on the parent's conduct and whether the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home— including physical violence or abusive conduct by one parent toward the other parent—is part of the environment under subsection (D). *Id.* Subsection (D) primarily concerns the environment

4

as it existed when the child was removed, *In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *Ybarra v. Texas Dep't of Human Servs.*, 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi 1993, no writ), while the relevant time period for subsection (E) is wider and considers parental conduct occurring "both before and after the child has been removed by the Department." *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861, at *4 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.).

In September 2018, the Texas Department of Family and Protective Services filed its original petition seeking conservatorship of the children with a removal affidavit in which Department investigator Erica Greene averred that in May 2018, it received a referral alleging neglectful supervision. That referral arose after the police were called to respond to a domestic disturbance between Mother and Father. It was reported that Father had left the scene and that Mother's blood was on the floor. Although Mother stated that the blood originated from a nosebleed caused by stress, it was reported that there was more blood than would be expected from a nosebleed and that Mother had previously stated that Father jumped on her back while she was lying on her stomach, pulled her up by her shoulders, and tried to take her cell phone. Mother stated that after Father took the cell phone he threw it across the room. The incident occurred with the children present and reportedly awake and huddled together on the couch. Green averred that the Department learned of another reported incident of violence between Father and Mother in the children's presence wherein Mother threw a cup of noodles at Father and Father responded by throwing a rock at Mother's car while she and the children were in it.

Mother and Father agreed to a safety plan that prohibited Mother and Father from being together with the children and established that Father would have visits with the children

supervised by his mother, W.E. (Grandmother). After determining that the safety plan had been violated, the Department filed its petition seeking sole managing conservatorship.

***Mother's challenge to statutory grounds***

In attacking the trial court's findings of statutory grounds under subsections (D) and (E), Mother states that the Department did not give her adequate help with obtaining the services and classes recommended by the Department that she was ordered to take to obtain the return of the children. Mother states that "[t]o the extent that all services are intended to ameliorate the effects of the original removal grounds, termination on the (D) ground is unconscionable where the parent had difficulty doing services." Assuming the accuracy of Mother's claim that the Department's help with obtaining services was inadequate, that has no bearing on whether the children were in an environment that endangered them when they were removed. *See J.R.*, 171 S.W.3d at 569. Mother also argues that "the incidents of domestic violence between the parents seem like property destruction, more than domestic violence," and, consequently, that "termination under (D) is not appropriate." However, both Greene and Kelsey Schatte, a counselor at the children's school, testified that the children had reported seeing Father hit Mother, causing her nose to bleed. Moreover, testimony about that incident of domestic violence between Father and Mother was not the only evidence presented at trial indicating that Mother knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being. Ericka Brothers, a psychologist who evaluated Mark, testified that Mark reported that his parents spanked him with belts all over his body, which hurt and left marks and bruises on him. Mark stated that Mother's boyfriend also spanks him. Further, Mark told Brothers that he was removed from his parents' care because

6

they needed help due to their fighting, and that he had witnessed his parents fighting and arguing both physically and verbally, which scared him. Brothers testified that exposure to trauma at home can increase the risk of a child developing a wide variety of psychopathy and creates a higher risk of developing depression, anxiety, difficulty managing anger, and defiant behaviors. Brothers also testified that living in an unstable environment and not feeling safe in the home puts children "on alert" and uses "emotional and cognitive resources" that should be directed toward other elements of child development. The children's great aunt J.W. (Great Aunt) testified that when the children came to live with her in September 2018, they all had to undergo extensive dental work including having several teeth removed. All three children had herniated navels that had to be surgically corrected, and there was testimony that not having the surgery done earlier caused the procedure to be more dangerous. Great Aunt stated that when they arrived at her house Charles would steal food from school and bring it home and that she had to reassure him that they would not run out of food. Charles would also bang his head on the wall, slap himself, and call himself names, and Mark was anxious, cried easily, and was not able to be alone. Clare's psychologist testified that Clare made remarks about wanting to kill herself, and her school counselor reported that Clare engaged in violent and aggressive behavior when she first began attending school. The witnesses testified that this behavior moderated and improved over time. The court heard extensive testimony about Mother's mental health issues, including Brothers' testimony that she diagnosed Mother with persistent depressive disorder with psychotic features and borderline personality disorder with schizotypal features. Mother testified that she experiences rage and blackouts when she gets angry and that when she gets upset she gets hostile and "just explodes."

We conclude that there was legally sufficient evidence presented at trial to support a subsection (D) finding of endangerment. Evidence of a parent's mental instability or of domestic violence in the home can support a finding of endangerment, *see e.g.*, *In re A.C.*, No. 10-15-00192-CV, 2015 WL 6437843, at *7 (Tex. App.—Waco Oct. 22, 2015, no pet.) (mem. op.); *In re K.P.*, No. 09-13-00404-CV, 2014 WL 4105067, at *14 (Tex. App.—Beaumont Aug. 21, 2014, no pet.) (mem. op.), and this record contains evidence of both. The court heard evidence of neglect of necessary medical and dental care, at least one child being concerned about not having enough food, and all three children exhibiting behaviors consistent with exposure to unstable and traumatic conditions when in Mother's care. We overrule Mother's legal sufficiency challenge to the trial court's finding under subsection (D).

Because we uphold the trial court's finding under subsection (D), we need not consider Mother's issues related to the other statutory grounds found by the court. *See Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.).

### Father's challenge to statutory grounds

Only one ground under Section 161.001(b)(1) is necessary to support a judgment in a parental rights' termination case—even if the trial court based the termination on more than one ground—so long as there is also a finding that termination is in the child's best interest. *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019); *Spurck*, 396 S.W.3d at 221. On appeal, Father challenges the trial court's finding under subsection (O) but does not challenge the other grounds for termination that are included in the trial court's judgment—subsections (D) and (E). Therefore, Father has waived any challenge he may have to those findings. *See Toliver v. Texas Dep't of Fam. & Protective Servs.*, 217 S.W.3d 85, 103 (Tex. App.—Houston [1st Dist.] 2006,

no pet.) ("Holloway does not challenge the sufficiency of the evidence supporting the findings under section 161.001(b)(F), (N), and (O), and thus he waives any complaint about the sufficiency of the evidence to support these findings). The trial court's unchallenged findings that Father committed conduct satisfying subsections (D) and (E) are sufficient to support the court's termination order provided this Court upholds the trial court's best interest finding. Because, as set forth below, we overrule Father's challenges to the best interest finding, we overrule Father's challenge to the trial court's order based on a complaint about the sufficiency of the evidence supporting one of the three statutory grounds supporting the termination order.

**BEST INTEREST**

Both Father and Mother challenge the legal and factual sufficiency of the evidence supporting the trial court's findings that termination of each of their parental rights was in the children's best interest. We review these challenges by considering the factors set out in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). Under *Holley*, we take into account the children's wishes, their emotional and physical needs now and in the future, present and future emotional or physical danger posed to the children, the parenting skills of those seeking custody, any programs available to assist those seeking custody to promote the children's best interest, plans for the children's future, the stability of the home or proposed placement, conduct by the parent that might show that the parent-child relationship is inappropriate, and any excuses for the parent's conduct. *Id.* The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child."

*In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The children's need for permanence is the paramount consideration when determining their present and future physical and emotional needs. *L.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00125-CV, 2018 WL 3059959, at \*1 (Tex. App.—Austin June 21, 2018, no pet.) (mem. op.); *In re D.R.A.*, 374 S.W.3d 528, 53 (Tex. App.—Houston [14th Dist.] 2012, no pet.). A parent's rights may not be terminated merely because the children might be better off living elsewhere, but the factfinder may consider whether termination and adoption versus an impermanent foster-care arrangement would better serve the children's best interest. *See L.R.*, 2018 WL 3059959, at \*1.

Sabrina Tuggle, the children's CASA volunteer, and Carol Wall and Cursten Roe, their Department caseworkers, testified that it was in the children's best interest for the parents' rights to be terminated and for the Department to pursue the possibility that the children be adopted by T.A. and R.J., a couple who are friends of Great Aunt, have met the children, and are becoming licensed to adopt. Tuggle testified that Mother has shown little progress since the Department became involved and that she has not taken responsibility for failing to complete the court-ordered services. Tuggle expressed concern about Mother's behavior, including aggressive and explosive outbursts, and that Mother was arrested in March 2020 for aggravated assault. Tuggle testified that she is also concerned that Mother is unwilling to share information with the Department about her current romantic partner and because of continued police involvement caused by Mother's behavior. Tuggle expressed concerns about Father, including his recent drug use, and his inability to provide the safety and stability the children need. Tuggle noted that Father himself testified that he is not ready to raise his children and that his plan for them to live with Grandmother was unsatisfactory because of the condition of her house. Tuggle testified that Great Aunt had decided she could not be a long-term placement for the children and that,

10

because of that decision, Tuggle had visited T.A. and R.J.'s home in February 2020. Under the circumstances, Tuggle testified that it was in the children's best interest that the parents' rights be terminated and the Department pursue adoptive placement for the children, ideally with T.A. and R.J.

Wall testified that at the beginning of her involvement in the case in September 2018, she had concerns about the children's emotional and behavioral issues. Charles engaged in self-harming behaviors such as hitting his head on the wall and hitting and threatening other children. Clare was defiant and Mark was very emotional and cried easily. Wall stated that all three children exhibited signs of food insecurity. The children also required extensive dental and medical care. Wall originally worked toward family reunification and attempted to assist Mother and Father to engage in services that would address the ongoing domestic violence and substance abuse as well as Mother's mental health issues and the children's behavioral needs. Although Mother reported that she stopped using marijuana in October 2018, Wall expressed concern that Mother was continuing to use marijuana to self-medicate for anxiety. Father reported that he used marijuana daily and that he occasionally used methamphetamine, which he did not consider to be a problem. Wall stated that Father and Mother attended most of the scheduled visits with the children and that the parents and the children seemed happy to see each other. Wall expressed concern, however, that Mother treated Clare like a peer and would get aggressive and raise her voice. Toward the summer of 2019, the parents' visits became sporadic and Father declined to visit the children unless Mother was also there. Tuggle testified that although Mother had participated in some therapy sessions, she had failed to consistently attend sessions and continued to display erratic behavior and outbursts and to minimize the Department's concerns and the children's behavior. Wall testified that she did not consider placement with Grandmother

11

to be in the children's best interest because of the condition of the home and because one of the home's occupants had a criminal history and another occupant was a registered sex offender. Wall testified that the Department was seeking termination of parental rights because Father and Mother failed to: show progress in the past two years, be transparent with the Department, and demonstrate an ability to provide a stable environment for the children, who were in need of significant therapeutic interventions to address their emotional and psychological needs.

Roe testified that it was in the children's best interest for Father's and Mother's parental rights to be terminated so that the Department could proceed with the prospective adoption by T.A. and R.J. Roe stated that Great Aunt was unable to serve as a long-term placement and that Grandmother was not a suitable placement for the children because Grandmother's house was cluttered with dangerous items and there were multiple people living in the house and in a shed in the back yard. When Roe visited Grandmother's home, she observed a box of condoms and an open pack of cigarettes, along with clothing, in one of the bedrooms, indicating that someone was living in that bedroom. Roe observed that Grandmother, who was 75 years old, struggled to get around, and although Grandmother and the children have a close relationship, Roe was concerned about Grandmother's ability to handle three very active children who did not listen to her. Roe testified that the Department considered other relatives as placements but a stepmother and a sister refused to do a home study and a cousin was not considered as a placement because she was a working mother with three children under the age of six. Roe testified that she had seen Mother have multiple outbursts, including in the courthouse, and had witnessed Mother yelling at attorneys and calling them names. Roe expressed concern that Mother had not completed anger management courses and was not addressing her mental health issues. Mother also refused to provide information to the

12

Department about her current romantic partner. Roe stated that Mother cannot provide the children with the structure, patience, and support they need; is defensive when given advice about the children's therapeutic needs; and is triggered by descriptions of their concerning behaviors. Roe testified that Father is calm around the children and has been respectful of the Department but has also been candid about his inability to currently care for the children and has asked that they be placed with Grandmother. Roe testified that in the six months before trial, the children's behavior has improved in response to structure, therapy, and medications. Roe testified that she had discussed the children's needs and behavioral issues with T.A. to ensure that T.A. is aware of the severity of some of the behavioral problems and that T.A. has been in regular contact with the children over the past few months.

Brothers testified that she evaluated Father in 2019 and that he did not engage well, was reluctant to share, and declined to discuss his past arrests because he believed they were not relevant. Father told Brothers that the Department became involved with the family because of arguments between Mother and Father but denied any domestic violence. Brothers gave Father a provisional diagnosis of antisocial personality disorder based on his spotty employment history, his lack of empathy and consideration of other people's feelings, and his failure to follow through on his obligations to others. Brothers noted that Father had recurrent arrests as an adult for drug dealing, which he did not deny, and that there were recurrent allegations of domestic violence between Father and Mother. Brothers testified that antisocial personality disorder can interfere with a person's ability to be consistently involved in the children's lives and creates a risk of abusive behavior toward the children.

Brothers also evaluated Mother who, although guarded at first, eventually opened up to Brothers in a meaningful way. Mother testified that she had a history of chronic depression

13

and difficulty managing feelings of anger. Mother reported recurrent abusive relationships and problems in school. Brothers diagnosed Mother with persistent depressive disorder with psychotic features and borderline personality disorder with schizotypal features. Mother was forthcoming about domestic violence between her and Father, stating that he "beat" her on more than one occasion. Mother described periods when she blacked out because of anger and reported that she heard voices when she was particularly depressed and that the voices "put her down" and "sapped her of her motivation and self-esteem." Mother stated that none of her mental health issues affected her parenting and that her children are the only thing in her life that makes her feel better. Brothers testified that she recommended that Mother reestablish consistent psychiatric care and re-commence taking prescribed medications to get her mood swings and psychotic symptoms under control. Although Mother was sincere in acknowledging she needs treatment, Brothers was concerned that Mother was adamant that her symptoms disappeared when she was with her children. Brothers stated that she was skeptical that a person reporting Mother's symptoms could be a calm and stable parent at all times. Brothers was doubtful that a person could compartmentalize that level of psychopathology and shield the children from it. Brothers testified that Mother was likely exaggerating the degree to which she was able to keep her mental health issues from affecting her ability to parent the children.

Mother testified that she completed a Nurturing Parent Class in April 2019 in which she learned that stability is important for children and learned techniques for disciplining them. She learned the importance of routine in the household and not lashing out at the children. After completing the class, Mother was arrested for assault, the case was still pending at the time of trial, and Mother stated that the charges against her are false. Mother testified that she was unsuccessfully discharged from therapy because she did not have transportation to get to her

sessions and does not recall being assigned a mobile therapist. She testified that she was unable to complete a Batterers Intervention and Prevention Program due to numerous court dates and her belief that she could substitute that program for one ordered as a condition of her probation. Mother stated that she takes medication for her mental health issues and that when she is not taking her medication, she feels more depressed. Mother testified that she has experienced rage and blacks out when she fights but does not let her children see her get angry; that she did not recall stating that she heard voices; that she did not have a problem with anger; and that she plans to address her mental health issues as she has in the past by staying away from people, isolating herself, and getting therapy. Mother testified that she lives in an apartment with enough room for all three children, that she wants them home with her, and that she has lived in the apartment for three months, having moved there to get away from people and be isolated. Mother stated that if the children were returned to her care she would find a job working from home and would stay home with the children. Mother testified that she does not want to lose her parental rights and that if the children are not returned to her she would want them to live with Grandmother.

Mother testified that she realizes she needs to change her behavior to have her children returned to her care and stated that she is willing to work on that. Mother testified that she has been antagonistic to the Department because she believes that their goal from the beginning was to terminate her parental rights. Mother acknowledged that the progress she believes she has made sometimes gets lost in her frustration over the situation. Mother testified that she has calmed down and learned to control her emotions but admitted that she was arrested in February 2020 for aggravated assault with a firearm. Mother denied calling the police in May 2020 to report that her boyfriend was abusive and testified that her boyfriend does not live with her.

Father testified that he believes he has made progress toward becoming a better parent but that he is not yet ready to care for the children. Father stated that he last saw the children in February or March of 2020 and that he had difficulty communicating with the children because of Great Aunt's schedule and because he did not have Facetime on his cell phone. Father testified that Grandmother has Facetime sessions with the children, but that he does not. Father stated that he went months without seeing the children because although he tried to see them "nobody else put any effort into it." Father completed a Nurturing Parent Class and participated in therapy but stopped going to sessions because he disagreed with the therapist's assessment that his upbringing caused him to start using drugs. Father stated that he became frustrated with the therapist because he knows his substance abuse issues have nothing to do with his upbringing but with choices he has made. Father stated that he did not complete a Batterers Intervention and Prevention Program because he did not understand that he was being asked to do so. Father stated that while the Department has been involved with his family he has used marijuana, methamphetamine, and cocaine. Father acknowledged that he last used methamphetamine in March 2020, cocaine in January 2020, and marijuana two weeks before trial. Father agreed that he cannot safely parent his children while using drugs.

Father expressed his desire that the children be placed with Grandmother while he participated in programs addressing his substance abuse issues. He testified that the other people who were living there moved out in March 2020. Father stated that although Grandmother has arthritis in her knees she gets around fine and can take care of the children with his help. Father testified that his brother could also help Grandmother and that although Father understands that the children are challenging, they listen to Grandmother and she would be able to ensure that they continued therapy sessions. Father's plan for the children is for them to live at

16

Grandmother's house where he and Charles would share a room, Mark would have his own room, and Clare would share a room with Grandmother. Grandmother's boyfriend would sleep on the couch.

Great Aunt testified that the children have made significant progress controlling their behaviors since coming to live with her and that they are improving at school both academically and behaviorally. They are attending therapy regularly and are doing well in structured home with rules. The children are participating in online activities, Charles has stopped hitting himself, Mark is less anxious, and Clare is more focused. Great Aunt stated that the children have expressed a strong desire to continue to live with her. However, she does not believe she would be able to take care of the children long term because of her commitment to her own children and she testified that although it was a difficult decision to make, she had to be honest about her abilities. Great Aunt expressed concern with the children living with Grandmother because of her age and her health.

The Department's plan is to work toward adoption by T.A. and her husband, R.J. T.A. testified that she is a first-grade teacher and that R.J. is an engineer. She stated that she loves children and that they naturally gravitate toward her. She and R.J. have been married for twelve years and, although R.J. has always been a law-abiding citizen, he recently experienced the loss of his mother, was laid off from his job, and was arrested for driving while intoxicated, his first offense. T.A. stated that R.J.'s attorney believes the charges will be dismissed but that the case has stalled because of COVID-19. T.A. testified about her experience with special needs children and her commitment to addressing their needs with patience and love. She has worked with physically violent children in a transitional living facility and as a youth care worker at the Austin Children's Shelter.

We consider this best-interest evidence in light of the *Holley* factors. First, the children have expressed a desire to continue to live with Great Aunt rather than return to Mother or Father. Although the children are strongly bonded to Grandmother, there was no evidence of their desire to live at her house full time. The witnesses consistently testified that the children need to continue therapy and to live in a safe and structured home environment to meet their emotional and physical needs. Father acknowledged that he lacked the parenting skills necessary to have the children returned to him and evidence showed that Mother has serious mental health issues, which she acknowledges but does not believe impact her ability to parent the children. The Department testified that it would work toward placing the children with T.A. and R.J. once they have been licensed to adopt the children. T.A. testified about her experience with children and her desire to provide these children a safe and structured home and to continue with the therapies they need to address their emotional well-being. The evidence regarding the children's present and future needs weighs in favor of termination. We hold similarly as to the present and future danger posed to the children: the children had been exposed to significant trauma when they were removed; they had significant dental and medical needs that had been unmet; and exhibited aggressive and threatening behavior toward each other and other children. Father's plans for the children are that they live with him in Grandmother's home, a home that was found inadequate by the Department because of its condition and other occupants. Mother's plan was to have the children live in her apartment and for her to find a job working from home where she could address her mental health issues by being with her children and isolated from others. The Department witnesses expressed concerns about Mother's ability to parent given her mental health issues and because they had no information about Mother's boyfriend. The evidence related to the competing plans for the children's future also weighs in favor of termination.

18

Both Mother and Father completed parenting classes, but neither completed therapy or a Batterers Intervention and Prevention Program. Father admits that his substance abuse is inconsistent with parenting the children. Mother failed to acknowledge that her mental health issues have a negative impact on her ability to parent and, although she has expressed a desire to continue therapy and medication to manage her symptoms, her health care providers expressed concern about her minimization of the severity of her issues and their impact on her parenting skills. The evidence related to parenting skills on balance weighs in favor of termination.

Having considered the evidence related to best interest, deferring to the trial court's determinations on witness credibility, the resolution of conflicts in the evidence, and the weight to be given the testimony, *see A.B.*, 437 S.W.3d at 503, we hold that the *Holley* factors weigh in favor of the trial court's finding that termination is in the children's best interest. We conclude that the evidence, viewed in the appropriate light, is both legally and factually sufficient to support the trial court's finding that termination of Father's and Mother's parental rights was in the children's best interest. We overrule Father's and Mother's challenges to the best-interest findings.

### Courtroom Procedures

In his appeal, Father challenges the conduct of the trial court during the bench trial, specifically complaining that the court abused its discretion by making comments during the proceedings and by examining witnesses. Father contends that the trial court's conduct assisted the Department and deprived him of a fair and impartial tribunal.

Father acknowledges in his brief that no party objected to the court's questions. "As a prerequisite to presenting a complaint for appellate review, the record must show that:

19

(1) the complaint was made to the trial court by a timely [] request, objection, or motion . . . and" (2) the trial court ruled or refused to rule on the objection and the complaining party objected to the refusal. Tex. R. App. P. 33.1(a). There is no exception to this rule when the complaint is about how the trial judge conducted the trial. *Sklar v. Sklar*, 598 S.W.3d 810, 825 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (addressing need to preserve complaint that trial court abused its discretion by questioning witnesses and by advocating for one party). However, even if, as Father maintains, there is no need to object when the trial court's questioning goes beyond seeking clarification of witness testimony and constitutes advocacy, we conclude that the trial court did not abuse its discretion in questioning the witnesses and commenting that the court would like to hear evidence about the Department's plans for securing an adoptive placement.

The discretion vested in the trial court over the conduct of a trial is great and includes putting competent and material questions to a witness. *Born v. Virginia City Dance Hall & Saloon*, 857 S.W.2d 951, 957 (Tex. App.—Houston [14th Dist.] 1993, writ denied). In a bench trial, the judge may question witnesses to clarify facts on an issue that the judge must decide in fulfilling the role as a factfinder. *See e.g.*, *Bhamani v. Citizens Enters.*, No. 11-13-00041-CV, 2015 WL 1779055, at *8 (Tex. App.—Eastland Apr. 6, 2015, no pet.) (mem. op.). We review the trial court's questioning of a witness for an abuse of discretion. *Id.*

The trial court's role in questioning witnesses is particularly important during a bench trial when the best interest of children is at stake. *See Trahan v. Trahan*, 732 S.W.2d 113, 114-15 (Tex. App.—Beaumont 1987, no writ). In *Trahan* the court observed that when the best interest of children is involved, "[t]he court should have all the facts possible in order to make an intelligent decision," and "[i]f the attorneys fail to develop the facts, it is the trial judge's responsibility to the children to attempt to do so himself." *Id.* On appeal, Father complains

20

about the court's questions to the Department supervisor about whether the Department ignored court orders and failed to provide a parenting coach for Great Aunt; the court's questions to the Department caseworker about the caseworker's efforts to secure effective therapy for the children, its efforts to provide transportation for Father to obtain a substance abuse evaluation, and how the children had improved throughout the case; the court's question regarding the likelihood of the Department securing an adoptive placement for all three children together; the court's questions to T.A. about her familiarity with the children and her husband's DWI arrest; and the court's questions to Great Aunt about how the children's behavior and health had changed since they came into the Department's care. The questions reveal that the trial court was attempting to elicit information it needed to resolve the case and did not evince bias or prejudice but instead were appropriately connected with the trial court's task of determining what would be in the children's best interest. The questions do not reveal any bias against Father or in favor of the Department; to the contrary the trial court's inquiries were principally directed at determining whether the Department had conducted itself in a manner that would comport with its stated intent in this case to facilitate family reunification.

Father also complains about the following colloquy between the trial court and counsel for the Department:

The Court:    So who [else] from the Department [will testify]?

Counsel:    Just Cursten Roe is the only person remaining.

The Court:    You don't—you don't think I might need to hear from somebody about adoptions?

Counsel:    Possibly.

21

The Court:   Well, we're going to find out later whether Miss Wall knows anything about adoptions. And maybe Miss Roe as well. But my experience has been that CPS caseworkers take the stand and tell me that they don't know anything about adoptions, and so then I'm left without any good idea about what the Department plan actually is in reality. And I would like to hear a little bit about that, if possible.

Father characterizes this comment as the trial court "practically order[ing] the District Attorney to secure a witness to address the Court's concerns about the children's adoptability, and then question[ing] that person." Father argues that without the trial court's direction, the Department would not have put on evidence addressing its plan for adoption. The record reveals, however, that Roe testified that the Department's plan was for T.A. and R.J. to adopt the children once licensed and that Great Aunt would keep the children until they were adopted by T.A. or another family. Tuggle also testified that T.A. and R.J. were being considered for adoptive placement and were nearing the end of the licensing period to become adoptive parents. To the extent Father's complaint is that the Department called Casey Jordan, a Department adoption supervisor, to testify, Jordan testified that R.J.'s DWI had to be resolved before the family could be licensed for adoption and that, if R.J. was convicted, the family would have to undergo a risk evaluation. Jordan also testified about the supportive services that would be available to an adoptive placement and agreed that finding an adoptive placement for a sibling group in need of at least a moderate level of care and with a history of physical aggression would be challenging. Jordan also acknowledged that the Department currently has children waiting for an adoptive placement. The testimony clarified that a conviction for DWI would not necessarily bar approval of T.A. and R.J. as adoptive placements, which may have favored the Department's case, but it also highlighted the possibility that the Department would be unable to secure a suitable adoptive

22

home for the three children together. Father did not object to this testimony at trial. We conclude that Father has failed to demonstrate that this testimony harmed him or caused the trial court to err in finding that termination was in the children's best interest. *See* Tex. R. App. P. 44.1(a) (requiring for reversal in civil case that error probably caused rendition of improper judgment). The trial court did not abuse its discretion in questioning the witnesses or by suggesting that the Department present testimony regarding the children's prospects for adoption. The Department's presentation of Jordan's testimony, even if it resulted from an improper request by the trial court, did not harm or prejudice Father or evidence any bias or partiality of the trial court. We overrule Father's issue challenging the manner that the trial court conducted the proceedings.

## CONCLUSION

For the reasons stated in this opinion, we affirm the trial court's final order of termination.

 

_____

Thomas J. Baker, Justice

Before Justices Baker, Kelly, and Smith

Affirmed

Filed: January 8, 2021