# Supreme Court of Texas

---

No. 19-1069

---

In the Interest of J.W., a Child

---

On Petition for Review from the
Court of Appeals for the Tenth District of Texas

---

JUSTICE BLACKLOCK, joined by JUSTICE DEVINE and JUSTICE BUSBY, dissenting.

Each week, during the pendency of this case, Father drove to the offices of the Department of Family and Protective Services to visit his son. He took pictures with him, heard him learn to speak, watched him play, and held him. Each week, Father had to leave the office without his son. After years in litigation defending his natural and legal right to raise his son, Father should finally be able to walk away with his son.

Because of Mother's endangering actions, not Father's, Father has never had a chance to live together with his son as a family. If the Department's fear that Father will endanger the son he loves comes to pass, the Department can get involved just like it does with other parents who fail in their sacred responsibility for their children. But in a trial focused on Mother's misdeeds, the Department's case against Father amounted primarily to speculation that he *might not* provide a

safe home for his son *in the future*. That is not a predicate ground for termination.

The case against Father includes no clear and convincing evidence that he endangered his son or that he violated his service plan. Only by mistakenly using the service plan as a basis to speculate about *future* endangering conduct Father *might some day* commit can the Court reach its conclusion that sufficient evidence supports the subsection (O) finding. But Texas law requires more. Parents who have *already* endangered their children are eligible for termination of their rights under subsections (D) and (E). Parents whom the Department fears will do so in the future are not—and we should not allow service plans under subsection (O) to surreptitiously relax the endangerment thresholds chosen by the Legislature in (D) and (E). The law—both Texas statutory law and higher sources of authority with which we should be loathe to interfere—entitles Father to be given a chance to raise his son. He should not lose his son because of his wife's failings. And he should not lose his son due to untested speculation about whether he can raise his son well. He deserves a chance to be the Father he claims he wants to be, a chance he has never had.

The Court sends the case back down to be tried again. *Ante* at 2. Although this is a victory of sorts for Father, in my view he is entitled to more. We should reverse the judgments below and render judgment for Father. I therefore respectfully dissent.

* * *

The Court holds that legally sufficient evidence supports termination of Father's rights under section 161.001(b)(1)(O) of the

2

Family Code. *Ante* at 29. I cannot agree that the record here comes close to demonstrating the sort of violations of a court-ordered service plan for which a father can lose his fundamental right to his child—or a child lose his fundamental right to his father.

Start with the statute. Subsection (O) serves as a predicate for termination of parental rights only when the parent "failed to comply with the *provisions* of a court order that *specifically* established the *actions* necessary for the parent to obtain the return of the child." TEX. FAM. CODE § 161.001(b)(1)(O) (emphases added). The court-ordered service plan must be "specific" and must state "the actions and responsibilities that are necessary for the child's parents to take to achieve the plan goal" as well as "the assistance to be provided to the parents by the department . . . toward meeting that goal." *Id.* § 263.102(a)(1), (7). In every case, the Department "must write the service plan in a manner that is clear and understandable to the parent in order to facilitate the parent's ability to follow the requirements of the service plan." *Id.* § 263.102(d).

The words of subsection (O) matter. A parent must comply with the *provisions* of the order, not the spirit of it or the Department's[1] understanding of a provision's purpose. The order must establish the *actions* the parent must take to get his child back. The service plan's requirements must therefore be achievable by the parent's *actions*—not

---

[1] At trial, the Department requested that it be referred to as "the Department" or "CPS," but not as "the State" or "the government." The court granted that request. I cannot imagine why calling the Department exactly what it is—the government—could be objectionable. In any event, we need not abide by that restriction. "The government" and "the Department" are used interchangeably here.

3

by the parent's mental state, or the Department's assessment of the parent's mental state. Finally, the required actions must be stated *specifically*. The specificity requirement reinforces that the Department cannot impose requirements on the parent that are not explicitly stated in the plan. The specificity requirement should also prevent the Department and the courts from reading unstated caveats into the explicitly stated elements of the plan.

At bottom, compliance with subsection (O) is about checking boxes on a checklist. Whether a service plan has been complied with should be objectively determinable from the *actions* taken by the parent. It cannot turn on the subjective opinion of the Department about whether the parent *really meant it*, or what the parent is likely to do *in the future*. If the parent took the *action* required by the plan, that is enough.

My dispute with the Court concerns its treatment of the requirement in Father's service plan that he "maintain a safe and stable home environment."[2] The Court's principal error is using subsection (O) to smuggle in the Department's concern that Father would not, *in the future*, be sufficiently "protective" of his child. For the Court, this suspicion about Father's *future* actions and intentions means that

---

[2] The service plan became effective when entered by court order on July 12, 2017. A second service plan was filed on August 3, 2017. Father was required under the service plan to submit to random drug testing, establish paternity, maintain a steady income, sign releases of records, attend supervised visits, undergo a parenting assessment, and maintain a crime-free lifestyle. There is no dispute that Father fulfilled every single one of these requirements. The Department waived various other requirements that it found were unnecessary.

4

Father did not "maintain a safe and stable home environment" for his son. *Ante* at 29. This approach to the service plan converts what should be an objectively verifiable box-checking exercise into a completely subjective, open-ended, forward-looking invitation to speculate about all the ways in which Father might not make good on his earnestly stated intention to take good care of the child he loves. But the question is not "Will the child's life be safe and stable if Father has custody?" The question is, as I understand it, "Does Father have a reasonably safe and stable physical location where he can live with the child?"

In assessing compliance with this service-plan provision, the Court's focus should be on the physical suitability of the place Father designated as the child's home. Otherwise, subsection (O) swallows the other termination grounds involving endangerment of children. Subsections (D) and (E) are specifically focused on parental conduct or decisions that endanger children—just the kind of thing the Department suspects Father will do in the future, which it fears will create an unsafe and unstable home environment (all because of predictions about Mother's future misbehavior, not Father's). Both (D) and (E) are explicitly backward looking. Broadly speaking, they require a showing that, in the past, the parent "engaged in conduct" that endangered the child or "knowingly placed" the child with someone who did. TEX. FAM. CODE § 161.001(b)(1)(D), (E). Fear that a parent will do those things *in the future* is not enough to satisfy (D) or (E). *See In re J.R.*, 171 S.W.3d 558, 570 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("The unambiguous language of subsection [161.001(b)(1)(D)] requires proof of Crystal's knowing exposure of the children to an endangering

5

environment in the past. Any alleged likelihood that Crystal will knowingly expose the children to a dangerous environment in the future is not sufficient to prove a violation of subsection [161.001(b)(1)(D)].”); *In re R.S.-T.*, 522 S.W.3d 92, 109 (Tex. App.—San Antonio 2017, no pet.) (“The relevant period for review of conduct and environment supporting termination under statutory ground D is before the Department removes the child.”); *see also In re J.F.-G.*, 627 S.W.3d 304, 323 n.4 (Tex. 2021) (Blacklock, J., dissenting) (“Subsection (E) is explicitly backward-looking . . . . A parent’s *future* plan to place his children with people the court deems dangerous is not a violation of subsection (E).”).

But the Court relies on exactly that—the fear of the Department’s witnesses about how Father will take care of his son in the future—to find that Father violated his service plan by failing to “maintain a safe and stable home environment.” *Ante* at 24–25. A service plan that essentially rewrites other statutory termination grounds in a way that is less protective of a parent’s rights surely cannot be enforceable. In any event, when there are two ways of understanding a service-plan requirement—one that amounts to an objective box-checking exercise and another that authorizes the factfinder to engage in forward-looking speculation about a parent’s future behavior that would not be allowed by subsections (D) and (E)—surely courts must apply the former.

The burden of proof is important as well. The Department bears the burden of proof in establishing the predicate grounds for termination. *See In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). That burden does not shift to the parent simply because the Department puts an affirmative requirement in a service plan. Rather than require

6

parents to prove *compliance*, the law requires the Department to prove *non-compliance*. In other words, parental rights can only be terminated under subsection (O) when the Department carries its burden of proof in showing that a parent failed to take the *actions* required *specifically* by the provisions stated in a court-ordered service plan. Speculation about whether a parent will continue, after trial, to take the action required by the service plan should be irrelevant. Father's obligation was to have followed the service plan as of the time of trial—not to convince the Department that he intended to follow it forever.

The standard of review likewise matters. "[W]hether a parent has done enough under the family-service plan to defeat termination under subpart (O) is ordinarily a fact question." *In re S.M.R.*, 434 S.W.3d 576, 584 (Tex. 2014). But because "parent and child share a 'commanding' and 'fundamental' interest preventing an erroneous termination of their relationship," we require clear and convincing evidence to establish the statutory predicates. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018) (quoting *Santosky v. Kramer*, 445 U.S. 745, 758–59 (1982)). Thus, a court cannot "involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE § 101.007). And "[a] correspondingly searching standard of appellate review is an essential procedural adjunct." *Id.* We "honor . . . the elevated burden of proof" by raising the legal-sufficiency standard above its ordinarily deferential posture. *Id.*; *see also In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) ("As a matter of logic, a finding that must be based on clear and convincing evidence cannot be

7

viewed on appeal the same as one that may be sustained on a mere preponderance.").

We have often cautioned that when conducting such review, courts should disregard evidence that "a reasonable factfinder could have disbelieved or found incredible" but not "*all* evidence that does not support the finding" because "[d]isregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). As we have always insisted, "conjecture is not enough." *In re E.N.C.*, 384 S.W.3d 796, 810 (Tex. 2012). Thus, the standard for disregarding evidence depends on whether a reasonable factfinder faced with competing accounts substantiated by pieces of evidence at crossways from one another could have reasonably chosen to believe the version of events that supports the finding.

\* \* \*

With these standards in mind, turn to the evidence. The Court holds that the Department put before the jury legally sufficient evidence to show Father failed to satisfy the service plan's requirement that he "maintain a safe and stable home environment." *Ante* at 29. The Court first decides that sufficient evidence existed for the jury to conclude that Father did not actually have a separate, presently available home for his son. *Ante* at 25. The Court further concludes that sufficient evidence supported the conclusion that any such home would be unsafe, primarily because Father has not demonstrated sufficient willingness to keep Mother away from the child. *Ante* at 26–28. I disagree on both counts.

8

Begin with the allegation that no safe, stable home was truly maintained by Father. To be sure, there is evidence that Father's primary residence was potentially an unsafe or unstable home environment.[3] His house was very dirty when caseworkers visited it on May 31, 2017 (about a month and a half before the service plan was first put in place). But since the service plan was put in place, Father has consistently maintained that he has access to a separate, clean, and safe home belonging to his sister-in-law, Nicole Taylor, to which he could take the child if he were given custody. The availability of that separate home—not the present state of his primary residence—should be the crux of this dispute.

For the proposition that the separate home was not presently available, the Court points to four different pieces of evidence. First, Father at one point claimed that he and Mother always intended to move in with Taylor to raise their son, but other testimony indicated that the plan to live with Taylor did not arise until after the Department removed the child. Second, there was evidence that Taylor had withdrawn from consideration as a placement home for the child earlier in the process. Third, the Department had not had a chance to inspect

---

[3] The Court notes that Father did not refute the evidence regarding the cluttered state of his home and that Father stated it was "irrelevant" because he had an alternative home available. *Ante* at 24. I would not construe this as a waiver of the argument that Father's primary residence was safe and stable. If the evidence put on by the Department was inadequate to show it was unsafe, then Father need not have put on additional evidence or refute that of the Department to show its safety and stability. Because I would hold that the service plan was satisfied by a safe, stable, and presently available alternative home, I do not assess the legal sufficiency of the evidence regarding Father's "cluttered" primary residence.

9

her home to determine its suitability. Fourth, Father has lived in his present home for forty years and has maintained it very poorly, and his car is likewise too full of trash to safely transport a child, so he has "provided no indication that he could maintain any future residence in a manner safe for a child." *Ante* at 25.

None of that evidence comes close to demonstrating that Taylor's home was unsafe, unstable, or unavailable. To start, why should it matter if Father did not *always* intend to take the child to another home, even before removal proceedings began? He was under no legal obligation to maintain a home environment that lived up to the Department's standards until the service plan was put in place. Once that obligation arose, he secured permission from Taylor to move into her home. And he also made future plans to sell his current residence in order to move to Fort Worth, where his family lives.

Nonetheless, the Department argues that the jury could have simply disbelieved Father's stated intent to move in with Taylor. The Department seems sure that Father's plans were baffling and unstable—a constantly shuffling array of infirm options. But his plan was straightforward and consistent: Once removal happened and the service plan was implemented, Father could no longer take the child to his primary residence, so he wanted to move in with Taylor, at least for a time, and then explore moving to Fort Worth in the future, which would bring him closer to his family and support systems. The Department points to no evidence that this sequence ever changed or that Father ever faltered in his intent. While the second step of moving to Fort Worth, like all future plans, has some level of uncertainty and

10

contingency, Taylor's home satisfies the service-plan requirement by itself. Surely the requirement to maintain a safe and stable home does not preclude having future plans to relocate to an even better one.

Next, why should it matter if Taylor withdrew from consideration as a placement home? There is a big difference between (1) taking *custody*—legal responsibility—of a child who has been removed from his parents, and (2) allowing the child and his father to live in one's home. Taylor may have had various reasons, including her own health, to prefer opening her home rather than taking custody of the child. She denied ever having withdrawn from consideration as a placement. But in any case, her uncontroverted testimony was that she had always been and still remained ready to allow Father and the child to live with her. No reasonable juror could infer from Taylor's alleged withdrawal as a *custody* placement that her willingness to host a reunited Father and son in her home was a bald-faced lie. When it became possible that the child could both stay with his Father and live in her home, Taylor evidently preferred that pathway. The Department presented no evidence to call that into question.

The Court further notes that the Department had not had the chance to inspect Taylor's home. *Ante* at 25. But that is not evidence the home is unsafe, unstable, or unavailable. It is a lack of evidence, and the Department bore the burden of proof. The Department has not argued anywhere in the briefing here that Taylor's home was unsafe, and witness testimony to that effect below was conclusory. To the contrary, the Department's witnesses complained only that there was some clutter to be cleared out before a child could be placed there, but it

11

found no unsafe or unsanitary conditions that would fail under the service plan.[4]

True, the Department wanted to inspect Taylor's home back at the very beginning of the investigation when Taylor was being considered as a potential foster parent. And when a home study was conducted, the Department had concerns about the readiness of the home at that time due to "clutter." But the Department has not shown that it pressed for an inspection of Taylor's home during the many months after Father suggested it in satisfaction of the service-plan requirement—that is, until the Department called Father the Friday before trial. The Department did not reach Taylor to discuss the matter. It merely speculated that the home was unsafe because it was not entirely ready.[5] But as any parent who has waited, for instance, to assemble a crib knows, there is a large gulf between an unsafe home and an unready home. Proof of the latter is not proof of the former. The talismanic invocation of the word "clutter" in the Department's

_____

[4] In fact, when counsel for Father represented at argument that CPS had approved Taylor's home for the child to live in, counsel for the Department did not contest that assertion, even when expressly asked if the Department disagreed. Counsel for the Department then said he may need to "step back" and said he was "not sure." He never followed up with the Court about the matter.

[5] The caseworker spoke with Father, not Taylor. According to the caseworker, Father said that Taylor might not be answering because she was not finished preparing the home yet. But the caseworker also recounted in that same conversation that Father had been at Taylor's home cleaning it up, and that he thought it would be ready within the next week. Thus, while there is some possibility that the home was not move-in ready, that does not mean that it was unsafe. And the caseworker's testimony undermines the Court's assertion that Father "had not taken practical steps to bring any such plan to fruition." *Ante* at 29.

testimony and briefing does not change that fact.[6] While a parent may not simply refuse a home inspection and thereby defeat termination, the Department's last-minute request falls well short of providing clear and convincing evidence the home was either unavailable or unsafe.[7]

Finally, why should it matter that Father has lived in an untidy home or that his vehicle has trash in it? The service plan's requirement was a presently available, safe, stable home, not a record of good behavior for cleanliness that proves one's capacity to keep house well. The condition of Father's home has nothing to do with the condition of Taylor's home, which is the one Father proffered in satisfaction of his service plan. And even if the condition of Father's home mattered,

---

[6] Some variant of the word "clutter" makes twenty-nine appearances in the Department's brief. This pales in comparison to the testimony at trial, wherein it makes well over sixty appearances—the apotheosis of which is captured in the exchange between counsel for Father and the Department's investigator about Father's home:

> Q: And you said that this home was different because it was -- the clutter. You didn't find any feces laying around?
> A: That's correct.
> Q: You didn't find any spots you thought might be urine?
> A: That's correct.
> Q: You didn't find cockroaches, ants, black beetles, none of that?
> A: That's correct.
> Q: You didn't find any drug paraphernalia laying around?
> A: As I stated, it was different due to the amount of clutter.
> Q: Okay. No knives or guns laying around?
> A: As I stated, it was different due to the amount of clutter.
> Q: Okay. So it was just the clutter?
> A: Correct.

[7] The trial began the following Monday, October 8, 2018. There was no other testimony regarding an attempted inspection after Taylor's purported withdrawal from the placement process beyond the attempt on the Friday before trial.

13

Father had lived in his home for forty years *without children*.[8]  His child never lived in the home.  We have no evidence at all of how Father would maintain a home in which a child lived.  He was never given a chance to try.  It cannot be the case that the difference between keeping and losing a fundamental right turns on whether Father cleaned up a house he did not intend his son to live in.  Rather than spend his limited time in the midst of overlapping personal crises cleaning up an old home that he planned to leave behind, Father focused first on locating a safe home for the child.  Isn't that what the Department wanted?[9]

In sum, unrebutted testimony established the availability of Taylor's home, the safety and fitness of which has never been seriously called into question.  Nevertheless, the Department's consistent position has been that Father's future plans to move into another home, such as

---

[8] Of course, we have zero evidence as to how Father maintained his home at any point during those forty years before the Department investigated on May 31, 2017—after Father had spent twenty-six nights of the previous month at the hospital with his child.

[9] The Court also refers in passing to evidence of a deficiency in Father's "ability to independently parent" the child. *Ante* at 25–26.  The only evidence referenced to support Father's lacking that ability was testimony that "during the early parts of the investigation" Father said he "would like to have somebody else there with him to help him care for his child."  Of course, that is exactly how most parents feel.  In context, Father said this in response to the proposed plan by the Department that he care for the child *without Mother*—who still had her parental rights at the time.  Understandably, Father expressed some hesitation about caring for the child without his wife, the child's mother.  But he also sought help from the nurses during the child's hospitalization to learn about parenting and spent time taking care of the child.  And in the early months of the investigation he was avid about learning from the Department as well.  There was no evidence at any time later in the case that Father would lack the ability to care for the child.  Instead, Father's counselor, who was called to testify by the Department, stated that she thought Father could be a good parent independently.

14

Taylor's, cannot satisfy the requirement to maintain a safe and stable home environment. As detailed above, however, the evidence established that Father had this alternative home available to him, and there was no requirement in the service plan that he presently reside in the home he offers in satisfaction of its requirements—imposing such a "present residence" requirement would impermissibly add words to the service plan.

Likewise, imposing an "intent to reside" requirement would add words to the service plan, converting a requirement that Father take the *action* of maintaining a suitable home into a requirement that Father possess the *mental state* of intending to live there (for how long?). The former is provable or disprovable with objective facts. The latter is a matter of opinion about another person's intentions. And if juries are as free to disregard a parent's testimony as the Court suggests they are, no parent can ever be confident he has sufficiently proven his intentions. If this is how it works, and if the Department decides not to believe you, then there is no *action* you can take to conclusively comply with your service plan.[10] Father's service plan could have been written to require him to "convince the Department that he intends to live in a safe and stable home environment with his son."[11] It does not say that. It just says Father must "maintain" such an environment. He did that, by

---

[10] Even if Father's intentions mattered, testimony from the Department affirmatively showed that Father worked to prepare Taylor's home for his son and had plans to continue doing so in the coming week. And Taylor testified that the child's room had been cleared out and was presently ready.

[11] Such a provision would likely be unenforceable for various reasons, but the point is that Father's plan did not even try to impose such a provision.

15

arranging with his sister-in-law to live with her. She testified to her willingness to take them in. There was no evidence her home was unsafe or unstable. That checked the box. Case closed.

Again, the Department bore the burden of proof to show by clear and convincing evidence that Father did not have a safe and stable home environment lined up for his son. Taylor's residence satisfied the service plan's requirement, and none of the Department's evidence clearly and convincingly undermined the availability, safety, or stability of her home.

* * *

The Department places great emphasis on Father's alleged lack of "protectiveness," despite that word's absence from the service plan or the relevant statutes.[12] No one has made any argument that Father himself engages in dangerous behaviors or would expose the child to drugs or crime. Instead, the assertion is that the evidence demonstrates his inability to say *no* to Mother, and *she* will make the home unsafe by bringing drugs or criminals into it. *Ante* at 26–28. The Court agrees with the Department that Father's "lack of protectiveness"—that is, his inability to guarantee that Mother would not reinsert herself into the life of the child—undercuts his claim to be able to maintain a safe and

---

[12] "Protectiveness" is a bit of Department jargon that appears to function as a catch-all justification for the Department's reservations about returning a child to his parents. The Court today notes its use by Department witnesses but does not determine whether a conclusory assertion of "lack of protectiveness" counts for anything at all. *Ante* at 33–35. I do not think it should. The factual details of the parental deficiencies alleged—not the labels used by the Department's witnesses—is what should matter in a sufficiency-of-the-evidence review.

16

stable home. The Court finds in various events "context for a pattern that continued throughout the termination proceedings." *Ante* at 28. That pattern allegedly shows that Father cannot protect the child from Mother's dangerous behavior.

This entire line of thinking is a red herring. The focus here should be on confirming compliance with a provision in a service plan, asking whether a box was checked. Yet the Department uses the words "safe" and "stable" in Father's service plan as a way of smuggling in its multifaceted concerns about Mother's behavior and Father's relationship with her. Asking whether the child's *life* will be safe and stable *in the future*—instead of whether the child's proposed living quarters is suitable for children at the time of trial—converts the subsection (O) inquiry into a free-wheeling best-interests analysis. In this scenario, any speculation about things third parties might do in the future to make the home unsafe or unstable is fair game. But that is not how this works. The correct question is whether the child will have a reasonably well-maintained place to live if he is returned to his parent. Here, the answer to that question was plainly yes.

Reading this service plan the way the Department does raises serious concerns about the plan's validity. The Department's approach, which the Court seems to adopt, is that a safe, stable home presently available to Father is not enough. For the Court, if the Department has reason to believe that the home may not remain safe and stable in the future, there is sufficient evidence to find non-compliance with the service plan. But very few parents in troubled circumstances can guarantee to the Department or a jury that potentially dangerous

17

influences will not re-enter their lives at some point. And the law does not require it of them. If speculation that Father's decisions *in the future* will endanger his son is enough to establish a violation of his service plan, then the Department has manufactured a new substantive termination ground—future likelihood of endangerment. Never mind that subsections (D) and (E) are explicitly backward looking—that the Family Code is written to impose consequences on parents who have endangered their children, not on parents whom the Department thinks might do so if given the chance. Apparently, by means of a service plan, the Department can require a parent who has not endangered his child to assure a jury that bad influences will not make their way into the child's life in the future. That is not the law. The Department cannot use service plans to expand the statutory grounds for termination in areas—such as endangerment—where the statute already speaks quite clearly.

Thus, none of what follows should have to be said. The Court's concern about Father's relationship with Mother and her problematic influence on the child should have nothing to do with Father's service plan, which does not mention Mother. Nevertheless, because the Court's analysis of the evidence about Mother and about Father's relationship with her falls short even on its own terms, I offer the following response.

The Court starts by noting that one caseworker believed Father and Mother were still in a close relationship even after they filed for divorce. *Ante* at 25–26. Father had even expressed his desire to help Mother after the divorce. This is not shocking, since they were, well, *married*. And it can hardly be the case that Mother was expected to

18

vanish upon divorce or upon her parental rights being terminated. Even the current foster mother—whose adoption of the child the Department supports—has said that she plans to allow Mother to keep in contact with the child. But Father is faulted here because he might still love Mother, might wish to see her on occasion, and might even hope to be reconciled to her someday. It is bad enough that the Department expects people to sever their bonds of marriage in order to prove their "protectiveness." It is inconceivable that it should demand spouses who get divorced at its suggestion to also gin up enough distaste for one another's company to satisfy the level of theatricality they expect from a "real" divorce.[13]

The Court then turns to incidents before the birth of the child when Father twice called the police to remove an evidently dangerous man from his wife's presence. *Ante* at 27–28. For his troubles, Father spent a night in jail after that man falsely accused him of domestic

---

[13] One key piece of evidence that the divorce was "in name only" appears to be that a courtesy worker for the Department visited Mother's apartment and found Father there after they had initially announced their intent to divorce several months before trial and before the couple filed for divorce. Father appeared to have been sleeping on Mother's couch that Friday afternoon. This was at Mother's apartment in Houston, where testimony elsewhere established that Father had been visiting that summer. It is relevant to note that the apartment was owned and lived in by the Salas family, whom Father and Mother knew well, and that Ms. Salas testified that she would invite him over to stay on the couch when he was in town.

The other key piece of evidence was that Father and Mother allegedly discussed waiting until after the trial was over to discuss having more children. But Father said that was a mischaracterization of his statement, which was that one cause for the divorce was that Mother wanted more children. He disclaimed any such intent, stating that he would not have children outside of marriage, that he had moral objections to doing so, and that after the divorce was final, he would not have children with Mother.

violence. It is hard to see how this illustrates Father's inability to maintain a safe home. Calling the police to protect his home and prevent wrongdoing would seem to indicate the opposite.

Much of the Court's analysis is then spent showing that Father downplays Mother's drug problems or fails to refuse her requests for help. Father once allegedly attempted to help Mother fake a drug test.[14] And he supposedly minimized her drug problems by disagreeing with the State about their severity.[15] But it is undisputed that Father went

---

[14] This took place after the birth of the child, when Mother was taking drug tests as part of her service-plan requirements.

[15] Importantly, the Department itself may have been misinformed about the severity of Mother's drug problems, as evidence shows some of its staff believed the child had tested positive for *methamphetamines*—a street drug— where he actually tested positive for *amphetamines*, a component of some common, legal drugs. Moreover, the Department's concern about Father downplaying the impact of Mother's drug use on the child, *ante* at 26, seems undercut by the Department's first witness, a pediatrician, who testified that MRI screening for after-effects of the withdrawal the child suffered after birth came back normal, with no observable effects upon the brain. The child undoubtedly suffered from difficult withdrawal symptoms such as jitters and poor weight gain, which, had Father not ensured that the child received medical care, could have been life threatening. But Father's testimony was that he was told by the doctors that the symptoms were "moderate," and the pediatrician did not directly contradict that testimony, instead insisting that it was "mostly subjective." Father expressly disclaimed ever saying this was a "slight issue" and instead stated that it was "serious." And his past behavior of extensively researching drug treatment options and going to great lengths to ensure his wife received drug treatment would indicate that he took the drug usage seriously. He testified that Mother was addicted to drugs during the pregnancy and that he helped her attend rehab. When asked who was responsible for the child undergoing withdrawal, he said it was "obviously [Mother]." The witness who testified that Father seemed to be downplaying the severity of the drug's effects on the child was a Department caseworker, not a physician. The notes from the counselor on which the caseworker relied do not actually say that he downplayed her drug problem. At trial, the

20

to extreme lengths to ensure that Mother received drug treatment. Downplaying a spouse's drug problems while talking to a counselor (who would testify for the government in ongoing proceedings against that spouse) seems rather to be expected.[16] And trying to shield one's spouse from the consequences of a positive drug test, is a far cry from allowing drug use around a child. Even if Father did the former, any suggestion he would do the latter was sheer speculation.

---

counselor said she believed Father was minimizing Mother's drug problems, but she did not elaborate.

[16] Much could be said about the Department's apparent process of *mandating* counseling, *choosing* the counselor for the parent, *requiring* the parent to sign releases of records from the counselor, and then having the counselor *testify against the parent* at trial. The Department even prevailed below on the argument that Father was not sufficiently "open" in these "counseling sessions"—or were they depositions? The court of appeals relied on the Department's testimony that it "considered [the counseling] requirement inconclusive or incomplete" because it determined that counseling had been "unsuccessful," even though Father literally complied with the terms of the service plan by completing his required counseling sessions. 627 S.W.3d 662, 670 (Tex. App.—Waco 2019). The Department has abandoned that argument here, and wisely so, as it would mean that parents are forced to be forthcoming with a counselor to the Department's satisfaction, even though anything they say can and will be used against them. Parents too unsophisticated to understand the legal process might freely tell the counselor all kinds of things any lawyer would beg them not to say to a potentially hostile witness. The more savvy parent may clam up, knowing their words can be used against them. But that only causes the Department to call the counseling "unsuccessful." I would have thought that "successful" counseling is much more likely if the parent can trust the counselor to maintain confidentiality. If, however, the Department's desire is to get another set of eyes and ears on the parent in an atmosphere where the parent is more likely to let his guard down, then its approach to "counseling" makes perfect sense.

Father also allowed friends of Mother on two occasions to stay in the couple's home after the friends had been released from jail.[17]  One stayed in the home before the child was born and overdosed while staying there.  Another pair stayed for the summer after the child was born and was no longer in the custody of the family.[18]  These acts of hospitality seem to have involved no wrongdoing on the part of Father, nor was there any evidence that any crimes were committed at his home, but this testimony led the Department to leap to the conclusion that Father could not protect a child from a "criminal element."  Again, the evidence shows only that he opened his home to others—once at Mother's request while she was pregnant and once jointly with Mother for two guests after the child had been removed.  That is all.  Such hospitality was consistent with his character for assisting individuals

---

[17] The evidence of two of the visitor's alleged criminal status is murky at best, coming as it did through second-hand testimony of the Department about what Father said he thought *might* have been the case.

[18] "Mike" stayed in the home in March 2017.  He was a friend of Mother who had known her for a long while and had been recently released from prison.  While at the home, late one afternoon, he passed out while standing on the front lawn.  Father took him to the emergency room. Testimony showed that he likely overdosed on Dilaudid, but it is not clear if the drugs were legally or illegally obtained.  He survived.

The pair—identified as John and Lorenzo—stayed from June to August in 2018.  Father was evidently not present for much of this stay, as he was away in Houston.  And while Lorenzo was a friend of Mother whom Father did not know well, John was identified as "his friend" whom he helped because he had no place else to go.  Father had known John for years and helped him considerably in the past. So while the Department presented this as evidence of his inability to "tell her no," at least one of the three guests was there on Father's invitation.

who needed it. But it is hardly the den of thieves lurking in the recesses of the Department's imagination.

The Court is concerned with the statement of Father's counselor that Father trusted Mother and refused, at Mother's request, to speak with caseworkers. *Ante* at 26. That is to say, after the Department made clear that its primary goal was not reunification of the family,[19] Father and Mother no longer wanted to make small talk with the Department. In short, he sided with his wife when they were in adversarial proceedings against the government—and for this he may lose his child.

But even if he trusted Mother to an excessive degree and allowed her to manipulate him, that still falls short of proving that Father would not make the home safe for the child. Not once has the Department shown that Father placed Mother's interests ahead of the interests of the child. In not one of these examples does Father allow harm to come to the child so that Mother can have her way. There is no proof that he ranks the wellbeing of his child below hers. There is no evidence *at all* of how Father balances his love for his child with his feelings for his wife, *because he has never had the chance*. The Department's fear that he will

---

[19] The Department's "primary" (or, "permanency") goal was unrelated adoption, but its "concurrent" goal was family reunification. *Ante* at 11 n.7. This apparently means the Department pursued both goals simultaneously. The service plan listed only the Department's primary goal. It did not state the concurrent goal. Whatever the merits of the officially required terminology, it is reasonable to assume that parents unversed in bureaucratic jargon could take the "primary goal" of unrelated adoption to mean that family reunification was disfavored, if not entirely off the table.

strike that balance poorly is pure speculation, based entirely on episodes not involving the child.

Calling the police on dangerous men, taking your wife's side against that of the government, and opening your home to friends of the family. These are not the sort of things for which one expects punishment in our legal system. But even accepting the Department's preferred spin on the above events, what does all that have to do with satisfying the service plan's requirement that Father have a safe and stable home available? Father testified that he would abide by any restrictions on Mother's visiting the child. He said he would divorce her to show he put his child first. Mother testified that she would stay away from the child if need be and that she would never again put Father in a position where he would have to contend for the right to raise their child. No protective orders are in place. No legal restrictions on her ability to visit the child with the consent of the child's custodian are in place. So how can it be that the bare possibility of her wielding influence over Father to gain access to the child for unspecified malicious purposes makes *this* home—really, *any* home—unsafe?

A supervisor for the Department stated its position bluntly: "[T]he Department considers [Mother] to not be safe and appropriate. Her presence in that household is enough for the Department to determine that that is not a safe or appropriate home for the child." In short, it was not enough for Father to provide a safe and stable living space. The Department wanted Mother gone. It deemed Father incapable of cutting his child's Mother out of the picture (one might have thought this a virtue, not a vice). And so the Department's position is

24

that *no home* Father and child live in will ever be safe—because of Mother. The problem, therefore, is not that Father *has not* complied with his service plan. Father *cannot* comply with his service plan, not because he cannot take the *action* it requires (he has done so), but because the Department has examined his character and found him insufficiently "protective." The Court blesses this approach, but in so doing it strays far afield from the actual requirements of the service plan, and it allows the Department to use the service plan to construct a substantive, forward-looking, likelihood-of-future-endangerment ground for termination.

At bottom, the Court takes aim at the wrong target. The actions of Mother—not Father—litter the pages of the majority's opinion. But it is Father's rights at stake, and he must be judged by *his* actions, not *hers*. We cannot demand that a father and husband do more than he has done to balance the needs of his child with the needs of his troubled wife. Reading the Court's opinion, one could walk away wondering how far a man must go to distance, disclaim, and deny any attachment to or affection for his wife in order to satisfy the Department's subjective determination of what qualifies as a stable home. Should he have divorced her immediately? Should he have sworn to never speak to her again? Should he have turned her into the police? How far, exactly, will the Court allow the Department to go in forcing a choice between the two most fundamental obligations in a man's life?

The Department's position would require that a parent be completely forthcoming with the State about his spouse's drug use *while her rights are still at stake* in order to demonstrate a "protective"

25

capacity sufficient to satisfy the Department's sense of what a "safe and stable home" means. In other words, here's your choice: throw your spouse under the bus, or lose your child instead. Whatever the merits of requiring spouses to protect their children from the dangerous and erratic behavior of the other parent, this far is too far. And not a word on Father's obligation to dispossess his son's mother is to be found anywhere in the service plan.[20]

* * *

The reader can scour the Court's opinion looking for the sin so egregious that Father should be eligible to lose his rights to his child. I cannot find it. The sins are all Mother's. Father's problem, we are told, is that he cares too much for his wayward wife. And he does not take out the trash. Neither is a predicate ground for termination of parental

---

[20] If the words "safe and stable home environment" are broad enough to encompass all that the Department insists they do, then that raises the question whether they are not specific enough to be statutorily authorized—and are consequently unlawful. TEX. FAM. CODE § 263.102(a)(1) (requiring that terms in the service plan "be specific").

rights.[21]  Because no predicate grounds were supported by clear and convincing evidence, I would render judgment for Father.[22]

---

[21] The Court does not reach the question of whether Father violated the second service-plan requirement at issue here—the requirement to contact the Department at least twice a month. *Ante* at 24 n.8.  I would hold that Father satisfied the requirement.  Father attended almost all weekly visits, which took place at the Department's office. *Id.* at 11.  This was contact.  The Department argues that his contact was not *meaningful* enough to satisfy the requirement.  But contact is contact.  If the Department wants something more, it can put the requirement in the service plan.  Father was within his rights to do only what the service plan specifically required of him.  He was not obligated to do it the way the Department wanted him to do it, unless the service plan made that obligation clear.

[22] I agree with the Court's reversal of the judgment below on the subsection (D) ground. *Ante* at 42.  The Court does not reach the subsection (E) endangerment ground, *id.* at 44 n.16, which requires clear and convincing evidence that Father "engaged in conduct" that "endanger[ed]" the child. TEX. FAM. CODE § 161.001(b)(1)(E).  The only danger alleged to the child was from Mother's drug use *in utero*.  I would hold that Father did not endanger his child by failing to do everything the Department in hindsight imagines he should have done to make his wife seek additional treatment for her drug problem.  The endangering "conduct" was all Mother's.  It is undisputed that Father encouraged his wife to seek treatment, drove her to treatment, and spent a considerable amount of time and effort helping her seek it early in the pregnancy.  She eventually rejected treatment, and Father could not force her to seek more.  Father's inability to compel his erratic, addicted wife to undergo medical treatment she did not want is not "conduct" by Father at all, much less conduct that endangered his unborn child in any measurable way apart from Mother's endangering conduct.  Only by side-stepping the words of the Family Code and the service plan and collapsing everything into the Department's free-ranging allegation of "lack of protectiveness" can Father's inability to compel his wife's medical treatment be used as the predicate for termination of his parental rights.

27

I respectfully dissent.[23]

James D. Blacklock
Justice

**OPINION DELIVERED:** May 27, 2022

---

[23] In Memoriam Holden Thomas Tanner (1995–2022).

That God, which ever lives and loves,
One God, one law, one element,
And one far-off divine event,
To which the whole creation moves.

ALFRED, LORD TENNYSON, IN MEMORIAM A.H.H. 131 (London, The Bankside Press 1900).